In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-1473 & 01-1477

Lena Gallagher, on behalf of a class, et al.,

Plaintiffs-Appellants,

v.

Abbott Laboratories and Miles D. White,

Defendants-Appellees.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 99 C 6869 and 00 C 765--James B. Moran, Judge.

Argued September 28, 2001--Decided October 17, 2001

Before Posner, Easterbrook, and Kanne,
Circuit Judges.

Easterbrook, Circuit Judge.  Year after
year the Food and Drug Administration
inspected the Diagnostic Division of
Abbott Laboratories, found deficiencies
in manufacturing quality control, and
issued warnings. The Division made
efforts to do better, never to the fda's
satisfaction, but until 1999 the fda was
willing to accept Abbott's promises and
remedial steps. On March 17, 1999, the fda
sent Abbott another letter demanding
compliance with all regulatory
requirements and threatening severe
consequences. This could have been read
as more saber rattling--Bloomberg News
revealed the letter to the financial
world in June, and Abbott's stock price
did not even quiver--but later
developments show that it was more
ominous. By September 1999 the fda was
insisting on substantial penalties plus
changes in Abbott's methods of doing
business. On September 29, 1999, after
the markets had closed, Abbott issued a
press release describing the fda's
position, asserting that Abbott was in
"substantial" compliance with federal
regulations, and revealing that the
parties were engaged in settlement talks.
Abbott's stock fell more than 6%, from
$40 to $37.50, the next business day. On
November 2, 1999, Abbott and the fda

resolved their differences, and a court entered a consent decree requiring Abbott to remove 125 diagnostic products from the market until it had improved its quality control and to pay a $100 million civil fine. Abbott took an accounting charge of $168 million to cover the fine and worthless inventory. The next business day Abbott's stock slumped $3.50, which together with the earlier drop implied that shareholders saw the episode as costing Abbott (in cash plus future compliance costs and lost sales) more than $5 billion. (Neither side has used the capital asset pricing model or any other means to factor market movements out of these price changes, so we take them at face value.)

Plaintiffs in these class actions under sec.10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec.78j(b), and the sec's Rule 10b-5, 17 C.F.R. sec.240.10b-5, contend that Abbott committed fraud by deferring public revelation. The classes comprise all buyers of Abbott's securities between March 17 and November 2. (One class consists of persons who bought securities in alza, a firm that Abbott proposed to acquire through an exchange of securities and whose market price thus tracked Abbott's. For simplicity we treat these plaintiffs as purchasers of Abbott stock.) The district judge dismissed the complaints under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief may be granted. 140 F. Supp. 2d 894 (N.D. Ill. 2001). The market's non-reaction to Bloomberg's disclosure shows, the judge thought, that the fda's letter was not by itself material or that the market price had earlier reflected the news, cf. In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989); Flamm v. Eberstadt, 814 F.2d 1169, 1179-80 (7th Cir. 1987); only later developments contained material information, which Abbott disclosed in September and November. Moreover, the judge concluded, plaintiffs had not identified any false or fraudulent statement by Abbott, as opposed to silence in the face of bad news. We are skeptical that these shortcomings justify dismissal for failure to state a claim on which relief may be granted; the judge's reasons seem more akin to an invocation of Fed. R. Civ. P. 9(b), which requires fraud to be pleaded with particularity, or the extra

pleading requirements for securities cases created by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. sec.78u-4(b)(1). But it is not necessary to decide whether Rule 12(b)(6), Rule 12(c), Rule 9(b), or the Reform Act supplies the best basis of decision. Nor is it necessary to decide whether the news was "material" before the fda's negotiating position stiffened, to decide whether Abbott acted with the state of mind necessary to support liability under Rule 10b-5, or to address other potential stumbling blocks. What sinks plaintiffs' position is their inability to identify any false statement--or for that matter any truthful statement made misleading by the omission of news about the fda's demands.

Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure. Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose. See, e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); Dirks v. sec, 463 U.S. 646, 653-54 (1983); Chiarella v. United States, 445 U.S. 222, 227-35 (1980); Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995); Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc). Until the Securities Act of 1933 there was no federal regulation of corporate disclosure. The 1933 Act requires firms to reveal information only when they issue securities, and the duty is owed only to persons who buy from the issuer or an underwriter distributing on its behalf; every other transaction is exempt under sec.4, 15 U.S.C. sec.77d. (No member of either class contends that he purchased securities from Abbott, or an underwriter on Abbott's behalf, between March 17 and November 2.) Section 13 of the Securities Exchange Act of 1934, 15 U.S.C. sec.78m, adds that the sec may require issuers to file annual and other periodic reports--with the emphasis on periodic rather than continuous. Section 13 and the implementing regulations contemplate that these reports will be snapshots of the corporation's status on or near the filing date, with updates due

not when something "material" happens, but on the next prescribed filing date.

Regulations implementing sec.13 require a comprehensive annual filing, the Form 10-K report, and less extensive quarterly supplements on Form 10-Q. The supplements need not bring up to date everything contained in the annual 10-K report; counsel for the plaintiff classes conceded at oral argument that nothing in Regulation S-K (the sec's list of required disclosures) requires either an updating of Form 10-K reports more often than annually, or a disclosure in a quarterly Form 10-Q report of information about the firm's regulatory problems. The regulations that provide for disclosures on Form 10-Q tell us which items in the annual report must be updated (a subset of the full list), and how often (quarterly).

Many proposals have been made to do things differently--to junk this combination of sale-based disclosure with periodic follow-up and replace it with a system under which issuers rather than securities are registered and disclosure must be continuous. E.g., American Law Institute, Federal Securities Code xxvii-xxviii, sec.602 & commentary (1978); Securities and Exchange Commission, Report of the Advisory Committee on the Capital Formation and Regulatory Process 9-14, 36-38 (1996). Regulation S-K goes some distance in this direction by defining identical items of disclosure for registration of stock and issuers' subsequent reports, and by authorizing the largest issuers to use their annual 10-K reports as the kernels of registration statements for new securities. But Regulation S-K does not replace periodic with continuous disclosure, and the more ambitious proposals to do this have not been adopted.

The ali's proposal, for example, was embraced by the sec, see 1933 Act Release No. 6242 (Sept. 18, 1980); 1933 Act Release No. 6242 (Jan. 31, 1982), but never seriously pursued, and revisions of Regulation S-K satisfied many of the original supporters of the ali's proposal. The advisory committee report, prepared by a distinguished group of scholars and practitioners under the leadership of Commissioner Steven M.H. Wallman, did not

persuade the sec's other members and was not taken up by the agency as a legislative plan or even as the basis of a demonstration project. Whatever may be said for and against these proposals, they must be understood as projects for legislation (and to a limited extent for the use of the sec's rulemaking powers); judges have no authority to scoop the political branches and adopt continuous disclosure under the banner of Rule 10b-5. Especially not under that banner, for Rule 10b-5 condemns only fraud, and a corporation does not commit fraud by standing on its rights under a periodic-disclosure system. The Supreme Court has insisted that this judicially created right of action be used only to implement, and not to alter, the rules found in the text of the 1933 and 1934 Acts. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173 (1994) ("We have refused to allow [private] 10b-5 challenges to conduct not prohibited by the text of the statute."); United States v. O'Hagan, 521 U.S. 642, 651 (1997).

Trying to locate some statement that was either false or materially misleading because it did not mention the fda's position, plaintiffs pointed in the district court to several reports filed or statements made by Abbott before November 2, 1999. All but two of these have fallen by the wayside on appeal. What remain are Abbott's Form 10-K annual report for 1998 filed in March 1999 and an oral statement that Miles White, Abbott's ceo, made at the annual shareholders' meeting the next month.

Plaintiffs rely principally on Item 303(a)(3)(ii) of Regulation S-K, which provides that registration statements and annual 10-K reports must reveal

any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The fda's letter, and its negotiating demands, are within this description, according to the plaintiff classes. We shall assume that this is so. The 10-K report did state that Abbott is "subject to comprehensive government regulation"

and that "[g]overnment regulatory actions can result in . . . sanctions." Plaintiffs say that this is too general in light of the fda's letter and Abbott's continuing inability to satisfy the fda's demands. Again we shall assume that plaintiffs are right. But there is a fundamental problem: The 10-K report was filed on March 9, 1999, and the fda's letter is dated March 17, eight days later. Unless Abbott had a time machine, it could not have described on March 9 a letter that had yet to be written.

Attempting to surmount this temporal problem, plaintiffs insist that Abbott had a "duty to correct" the 10-K report. Yet a statement may be "corrected" only if it was incorrect when made, and nothing said as of March 9 was incorrect. In order to maintain the difference between periodic-disclosure and continuous-disclosure systems, it is essential to draw a sharp line between duties to correct and duties to update. We drew just this line in Stransky and adhere to it now. If, for example, the 10-K report had said that Abbott's net income for 1998 was $500 million, and the actual income was $400 million, Abbott would have had to fix the error. But if the 10-K report had projected a net income of $125 million for the first quarter of 1999, and accountants determined in May that the actual profit was only $100 million, there would have been nothing to correct; a projection is not rendered false when the world turns out otherwise. See Wielgos v. Commonwealth Edison Co., 892 F.2d 509 (7th Cir. 1989). Amending the 10-K report to show the results for 1999 as they came in--or to supply a running narrative of the dispute between Abbott and the fda-- would update the report, not correct it to show Abbott's actual condition as of March 9.

Updating documents has its place in securities law. A registration statement and prospectus for a new issue of securities must be accurate when it is used to sell stock, and not just when it is filed. Section 12(a)(2) of the '33 Act, 15 U.S.C. sec.77l(a)(2); Regulation S-K, Item 512(a). Material changes in a company's position thus must be reflected in a registration statement promptly. But this does not imply changes in a 10-K annual report, even when that report is

used (as it can be with securities registered on Form S-3, or for a shelf offering under Rule 415) as the principal disclosure document. Instead of changing the 10-K report weekly or monthly, the issuer must file and distribute an addendum to that document bringing matters up to date. See Form S-3, Item 11. Anyway, as we've already mentioned, Abbott did not sell any stock to the class members during the period from March 17 to November 2, 1999.

As for White's statements at the annual meeting: he said very little that was concrete (as opposed to puffery), and everything concrete was true. White said, for example:

The outcome [of our efforts] has been growth more than five times faster than the diagnostics market. We expect this trend to continue for the foreseeable future, due to the unprecedented state of our new product cycle. By supplementing our internal investment with opportunistic technology acquisitions, Abbott's diagnostics pipeline is fuller than ever before.

The statement about past performance was accurate, and the plaintiffs have not given us any reason to doubt that White honestly believed that similar growth would continue, or that White honestly believed "Abbott's diagnostics pipeline [to be] fuller than ever before." Even with the benefit of hindsight these statements cannot be gainsaid. Here is where Rule 9(b) pinches: Plaintiffs have done nothing to meet the requirements for pleading fraud with respect to the annual meeting, even if it were possible (which we doubt) to treat as "fraud" the predictive components in White's boosterism. See DiLeo v. Ernst & Young, 901 F.2d 624 (7th Cir. 1990).

Affirmed