# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1761

_____

Minneapolis Firefighters' Relief     *
Association, on behalf of itself and all   *
others similarly situated,                *
                                   *
           Plaintiff,              *
                                   *
Mahendra A. Patel,               *     Appeal from the United States
                                   *     District Court for the Eastern
         Plaintiff/Appellant,       *     District of Missouri.
                                   *
       v.                         *
                                   *
MEMC Electronic Materials, Inc.;    *
Nabeel Gareeb; Kenneth H. Hannah,   *
                                   *
        Defendants/Appellees.     *

_____

Submitted:  April 12, 2011
Filed:  June 17, 2011

_____

Before RILEY, Chief Judge, BENTON and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

      Mahendra A. Patel is the lead plaintiff in this consolidated, but uncertified, class action securities lawsuit against MEMC Electronic Materials, Inc. (MEMC) and its former president and chief executive officer, Nabeel Gareeb (collectively, defendants).

Patel's proposed class action alleges violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 48 Stat. 891 (codified as amended at 15 U.S.C. §§ 78j(b) and 78t(a)). The district court[1] dismissed Patel's lawsuit, reasoning (1) the defendants did not have a duty to announce production failures to MEMC's investors immediately and, in any event, (2) Patel failed to allege "facts giving rise to a strong inference" of scienter, as required by § 21D(b) of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(2). Patel appeals, and we affirm.

## I.    BACKGROUND
### A.    Patel's Allegations

MEMC produces silicon wafers used in the semiconductor industry. MEMC produces polysilicon, the base material in MEMC's production process, from manufacturing plants in Pasadena, Texas, and Merano, Italy. A disruption of polysilicon processing at MEMC's Pasadena or Merano facilities would be "a catastrophic event resulting in days or weeks of lost production." The Pasadena plant generates more than two-thirds of MEMC's polysilicon.

On February 29, 2008, MEMC filed a Form 10-K (10-K) with the Securities Exchange Commission (SEC) disclosing risks associated with its business. Among other things, the 10-K revealed "a decrease in [MEMC's] manufacturing throughput or yields could have a material adverse effect on [MEMC's] operating results"; "interruption of operations at [the Pasadena plant] could adversely affect [MEMC's] wafer manufacturing throughput and yields and could result in [MEMC's] inability to produce certain qualified wafer products, delays or cancellations of shipments of wafers and a loss of product volume"; and, "[s]imilarly, an interruption [at the Merano plant] could adversely affect [MEMC's] results of operations."

---

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

### 1. Pre-Class Period Disclosures

Production problems at the Pasadena plant periodically have adversely impacted MEMC's financial results. Historically, MEMC updated investors about its problems.

On September 4, 2007, MEMC filed an SEC Form 8-K (8-K) to disclose a construction incident at the Pasadena plant which would negatively impact MEMC's financial results for the period ending September 30, 2007, by approximately 5%. On October 25, 2007, MEMC filed another 8-K to state the previously disclosed construction incident "caused [MEMC] to lose well over a week's worth of production, miss [MEMC's] cost projections by the double digit millions, and delay [MEMC's] expansion."

On January 24, 2008, MEMC held an earnings call in conjunction with the filing of another 8-K. At the earnings call, Gareeb indicated maintenance issues at the Pasadena plant would adversely impact earnings for the quarter ending March 31, 2008.

On April 3, 2008, MEMC filed an 8-K indicating MEMC's Pasadena plant needed premature maintenance to remove chemical deposits. MEMC disclosed the maintenance "resulted in much lower than anticipated output, and caused the company to not achieve the financial targets for the first quarter as disclosed on January 24, 2008." On April 24, 2008, MEMC filed an 8-K and commented on its first quarter results. MEMC opined, "given the unplanned issues" at the Pasadena plant, "it is prudent to be extra cautious regarding our polysilicon output expectations."

Also on April 24, 2008, the Pasadena plant suffered a gas leak, interrupting polysilicon production. MEMC immediately issued a press release disclosing the leak and assuring investors that MEMC did "not anticipate any impact to the financial targets provided earlier today as a result of this incident." On April 29, 2008, MEMC

issued a follow-up press release, confirming the Pasadena plant resumed production on April 25, 2008.

### 2. Class Period

On June 13, 2008, a fire at the Pasadena plant halted production for a week. Also in June 2008, a heat exchanger failed at the Merano plant, interrupting production overseas as well. MEMC did not immediately disclose either incident.

On July 23, 2008, the company filed an 8-K. Despite increased net sales, MEMC announced its financial results were "a bit below the bottom end of our targeted range" because of the previously undisclosed incidents at the Pasadena and Merano plants. At a contemporaneous conference call, a financial analyst from Oppenheimer asked Gareeb "what the reasoning was for not doing a pre[-]announce this time as you served down on in the past." Gareeb explained MEMC did not pre-announce the incidents because the estimated anticipated loss—2% below the bottom end of MEMC's second quarter projections—was immaterial. Gareeb also said MEMC "wanted to provide a second half up date that we would not have been ready to provide" and "have the demonstrated recovery both from the fire as well as the replacement of the equipment in Merano to ensure that we had a pretty solid set of numbers in our head" for the rest of the year.

Analysts from Deutsche Bank and Credit Suisse expressed surprise that MEMC had not pre-disclosed the financial consequences resulting from the incidents at the Pasadena and Merano plants. Credit Suisse concluded "[f]ear of the unknown" and "low disclosures make it difficult to evaluate if [MEMC] has the right team in place to execute." Oppenheimer opined "the magnitude of the miss [in results] was significant" because, "[h]ad it not been for [the incidents], MEMC would have exceeded the high-end of guidance."

On July 23 and 24, 2008, there was unusually heavy trading in MEMC's stock. MEMC's shares fell 21.51%, closing on July 24, 2008 at $42.23 per share, down from $53.80 per share. Patel lost over $383,000 as a result of his transactions in MEMC stock.

### 3.    Post-Class Period Disclosures

On August 5, 2008, MEMC issued a press release to warn that an impending tropical storm was "currently anticipated to have approximately a two day effect on polysilicon production" at the Pasadena plant. MEMC promised to issue another press release if circumstances changed.

On September 11, 2008, MEMC "issued a press release . . . reporting that it would be shutting down the Pasadena facility until early next week" due to an impending hurricane. On September 15, 2008, MEMC issued another press release about the hurricane. Gareeb told investors there was no major structural damage to the Pasadena plant and "restart activities commenced as planned over the weekend," but there were some delays caused by MEMC's suppliers' "own startup difficulties." On September 24, 2008, Gareeb cautioned investors that the suppliers' startup difficulties were lasting longer than MEMC had anticipated. Gareeb expressed hope that normal production would resume within the next few days but said, "we now expect the cumulative impact of these delays to be approximately 15 days worth of production instead of the 5 days originally forecasted."

On November 17, 2008, MEMC filed an 8-K. MEMC indicated "the weak macroeconomic environment has continued to deteriorate . . . causing negative effects . . . quickly cascading backward through global supply chains, and we cannot expect to be immune." On December 17, 2008, the company filed another 8-K revising downward its fourth quarter outlook.

## B.	Dismissal

Patel filed suit in September 2008.  In April 2009, the defendants moved to dismiss the complaint, contending Patel's § 10(b)/Rule 10b-5 claim should be dismissed for three alternative reasons: Patel failed sufficiently to allege (1) an actionable omission; (2) scienter; or (3) materiality.  See Fed. R. Civ. P. 12(b)(6).  The defendants argued Patel's § 20(a) claim should be dismissed because the § 20(a) claim was derivative of his § 10(b)/Rule 10b-5 claim.  In March 2010, the district court granted the defendants' motion, holding Patel failed to plead a material omission or scienter.  Patel appeals.

## II.	DISCUSSION

### A.	Standard of Review

We review the district court's dismissal of Patel's complaint de novo.  See Lustgraaf v. Behrens, 619 F.3d 867, 872 (8th Cir. 2010).  We accept as true Patel's factual allegations in the complaint and grant all reasonable inferences in Patel's favor.  See id. at 872-73.  We do not defer to the district court's "legal conclusions or 'formulaic recitation[s] of the elements of a cause of action.'"  Id. at 873 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Patel's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).  "The plausibility of a complaint turns on whether the facts alleged allow us to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Lustgraaf, 619 F.3d at 873.

### B.	Section 10(b)/Rule 10b-5

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe

as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b-5 implements [§ 10(b)] by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. __, __, 131 S. Ct. 1309, 1317 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

To prevail, a § 10(b)/Rule 10b-5 claimant ordinarily must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc., 552 U.S. 148, 157 (2008). Patel alleges material omissions, not misrepresentations. Assuming materiality, the district court held Patel did not sufficiently allege an actionable omission or scienter.

### 1.    Actionable Omission

Patel maintains the defendants had a duty to disclose the July 2008 incidents at the Pasadena and Merano plants. Patel believes the allegations in his complaint show the defendants had a "pattern" of disclosing similar disruptions in production. Patel concludes that, in light of MEMC's pre- and post-class period disclosures, the defendants' failure to disclose the incidents rendered MEMC's antecedent 10-K and press releases misleading.

The district court concluded the pre-class period disclosures could not create a duty on MEMC's part to disclose the incidents. Citing Gallagher v. Abbott Labs., 269 F.3d 806 (7th Cir. 2001), the district court reasoned, "Publically-traded companies are not required to disclose all information as soon as it comes into their possession simply because the information is material to stock prices." See id. at 808 ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all

information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure. Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."). The district court emphasized Patel "cites no case law to support the contention that . . . a 'pattern' [of disclosing events that affect stock prices] can give rise to a duty" to disclose promptly all such events. The district court ignored MEMC's post-class period disclosures as "irrelevant" to establishing whether defendants had a duty to make the disclosures.

Like the district court before us, we are unable to find any legal authority directly supporting Patel's pattern theory. Perhaps the best support for Patel's theory may be inferred from recent Supreme Court *dictum*. The Supreme Court in <u>Matrixx</u> wrote:

> [I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading. 17 C.F.R. § 240.10b-5(b); <u>see</u> <u>also</u> [<u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 239 n.17 (1988)] ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5"). *Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.*

<u>Matrixx</u>, 131 S. Ct. at 1321-22 (emphasis added).

Even if we should infer from <u>Matrixx</u> that a pattern of disclosure may spawn a duty to disclose, we do not believe Patel has alleged circumstances giving rise to such a hypothetical duty here. This is not a case, for example, in which MEMC had just told investors the Pasadena and Merano facilities were fully operational or in

perfect working order.  Instead, MEMC warned investors its business was vulnerable to any disruption at those plants.

"Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  In re K-Tel Int'l Sec. Litig., 300 F.3d 881, 891 (8th Cir. 2002) (quoting Acito v. IMC-ERA Grp., Inc., 47 F.3d 47, 53 (2d Cir. 1995)).  We decline to recognize a new cause of action absent extraordinary circumstances not present here.  To do so could encourage companies to disclose as little as possible.  Cf. Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760 (7th Cir. 2007) ("[W]hat rule of law requires 10-Q reports to be updated on any cycle other than quarterly?  That's what the 'Q' means.").

### 2.    Scienter

Even if Patel alleged an actionable omission, he failed to plead scienter under the PSLRA's special heightened pleading standard.  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  Id. at 323.  The Supreme Court explained:

> The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences."  Recall in this regard that § 21D(b)'s pleading requirements are but one constraint

among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. Yet the inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Id. at 323-24 (internal citations and footnote omitted).

Patel contends he sufficiently pled scienter, explaining he pled MEMC experienced production problems before and after the class period; the defendants knew production problems were material to investors' decisions; the defendants had represented that past production problems were resolved before the incidents; and confidential witnesses say Gareeb was actively involved in MEMC's day-to-day operations and knew any production problems would adversely affect MEMC's stock price.

We do not believe the inference of scienter is as compelling as the more innocent, simpler inference that the defendants did not believe they had a continuing duty to disclose information or, as Gareeb stated at the time, MEMC "didn't think 2% outside of the bottom of the range was material." See Tellabs, 551 U.S. at 324. There was no legal precedent supporting Patel's "pattern" theory at the time of the incidents; Patel does not allege any corporate executive personally benefitted from the non-disclosure, see In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1085 (8th Cir. 2005) (holding the fact that one executive-defendant sold 4% of his stock, and all other executive-defendants sold no stock, "decrease[d] any inference of scienter") (quoting K-tel, 300 F.3d at 895-96); and it is undisputed the defendants cautioned investors before the class period that MEMC's profits were vulnerable due to any problems at its Pasadena plant, see Geffon v. Micrion Corp., 249 F.3d 29, 37 (1st Cir. 2001) (holding the fact the defendant repeatedly warned its investors of a certain risk

undermined any inference of scienter). We disregard Patel's bald assertions of improper motive, see K-tel, 300 F.3d at 891, 894, and reliance on the allegations of confidential sources, see Higginbotham, 495 F.3d at 757-58 ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

### 3. Conclusion

Patel does not sufficiently allege an actionable omission or scienter for his claim. Patel's complaint must be dismissed.

### C. Section 20(a) Claim

Because we affirm the district court's dismissal of Patel's § 10b/Rule 10b-5 claim, we affirm the district court's dismissal of Patel's § 20(a) claim. See In re Hutchinson Tech., Inc. Secs. Litig., 536 F.3d 952, 961-62 (8th Cir. 2008).

### D. Motion to Amend

In the final footnote to his brief in opposition to the defendants' motion to dismiss, Patel asked the district court for leave to amend the complaint "if the Court finds that the Complaint is deficient in any respect." The district court denied Patel's motion, finding amendment would be futile because Patel "identifi[ed] no additional allegations he could make to cure the deficiencies."

Although ordinarily leave to amend should be freely granted, see Fed. R. Civ. P. 15, placing a footnote in a resistance to a motion to dismiss requesting leave to amend in the event of dismissal is insufficient. See In re 2007 Novastar Fin. Inc., Secs. Litig., 579 F.3d 878, 884-85 (8th Cir. 2009) (discussing Clayton v. White Hall Sch. Dist., 778 F.2d 457, 460 (8th Cir. 1985)). Patel also failed to file a Fed. R. Civ. P. 15(a), Fed. R. Civ. P. 59(e), or Fed. R. Civ. P. 60(b) motion (1) seeking leave to amend after the district court entered judgment, (2) attaching a copy of the proposed

-11-

amended complaint, and (3) specifying the additional allegations that would overcome the defendants' motion to dismiss. <u>See</u> <u>Novastar</u>, 579 F.3d at 884-85. The district court did not abuse its discretion in denying Patel's motion to amend. <u>See</u> <u>Morrison Enters, LLC v. Dravo Corp.</u>, 638 F.3d 594, 610-11 (8th Cir. 2011).

## III. CONCLUSION

We affirm the judgment of the district court.

_____