**Lee E. HASSIG, Appellant,**

**v.**

**Ray W. PEARSON, Jr. and A. T. Pearson, Appellees.**

**No. 76–1537.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Aug. 4, 1977.

Decided Nov. 11, 1977.

Phil M. Cartmell, Jr., Kansas City, Mo. (Bill E. Fabian, Kansas City, Kan., with him on the brief), for appellant.

Leonard O. Thomas, Kansas City, Kan. (John A. Price, and Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., of Counsel, with him on the brief), for appellees.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

SETH, Circuit Judge.

This is an action brought under section 10(b), Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and Rule 10b–5, and involves the sale of bank stock by the plaintiff to one of the defendants, an officer in the bank. Plaintiff Lee Hassig alleged that defendants A. T. Pearson and Ray W. Pearson, Jr., violated their duties to him in the purchase, and sought to recover as damages the profit which the purchaser, Ray Pearson, made by reselling the stock. The case was tried to the court which found it had jurisdiction, but that there was no violation of Rule 10b–5. Plaintiff has taken this appeal.

During the many years that defendant-appellee A. T. Pearson served as an officer and President of Fidelity State Bank in Kansas, he and his wife accumulated nearly one-half of its outstanding stock. Defendant Ray Pearson was employed as assistant cashier and assistant trust officer of Fidelity at the time of the purchase of Lee Hassig's stock. He is the nephew of A. T. Pearson. At the time of the transaction in question he owned but a few shares of the bank's stock. Plaintiff Hassig owns and operates a coin laundry in Kansas City. His father was a director of the bank with A. T. Pearson for a number of years prior to the father's death. There is evidence that because of this relationship Lee Hassig discussed business, borrowed money from the bank, and generally considered A. T. Pearson as a person he could come to for business counseling and advice. The stock at Fidelity was closely held, and minority shares had never been sold for an amount in excess of $125.00 per share.

In 1969 appellant Hassig discussed the possibility of selling his stock with A. T. Pearson. Mr. Pearson indicated he was not interested, nor was he aware of any prospective buyers. About a year later Lee Hassig placed his stock for sale with a broker, but was unable to find a buyer. Following this unsuccessful attempt to sell his stock, he once again approached A. T.

Pearson expressing a desire to dispose of his bank stock. This was in May or June of 1972. A. T. Pearson advised Hassig to keep his stock for the time being because a semi-annual dividend would be paid in July. After this dividend distribution Lee Hassig again went to A. T. Pearson to discuss the sale of his stock. Without asking A. T. Pearson's opinion as to the value of his stock, Lee Hassig stated he wanted $125.00 per share. Defendant A. T. Pearson expressed no opinion about the value of the stock, but did state he was not interested in purchasing this stock because he had control, and was giving consideration to retiring and selling his own stock. Plaintiff asked A. T. Pearson to sell plaintiff's stock with his, but A. T. Pearson said he wanted no "entangling alliances," and hence he would sell only his own stock, not Lee Hassig's stock as well. A. T. Pearson also said he knew of no prospective purchasers for Lee Hassig's stock at that time.

After this discussion, A. T. Pearson informed officers, directors, and stockholders that Lee Hassig wished to sell his stock for $125.00 per share. In mid-October 1972 Lee Hassig again inquired whether a purchaser of his stock had been found. At this time Lee Hassig stated he was quite anxious to dispose of his stock. Finally, during the early part of November, A. T. Pearson informed Lee Hassig that a purchaser for his stock had been found. Again A. T. Pearson informed Lee Hassig that he was considering a sale of his controlling interest in the bank. At this time plaintiff Lee Hassig asked if "there was anything going on the bank," and A. T. Pearson responded "no." Mr. Hassig did not ask who the purchaser of his stock was, nor why A. T. Pearson might sell his interest in the bank. Defendant Ray Pearson purchased the stock on November 14, 1972. Lee Hassig inquired who the purchaser was, and A. T. Pearson stated he was not free to say. The sale was consummated when Lee Hassig signed the stock certificates and received a Fidelity Bank cashier's check in the amount of $37,500.00. The check had been purchased and drawn by Ray Pearson and signed by A. T. Pearson as President.

In December 1972, A. T. Pearson had a number of "spells" or attacks of some nature. At this time A. T. Pearson agreed with friends to seriously consider selling his interest in Fidelity. There had been a number of general inquiries about the sale of the bank by Messrs. Hentzen and Burcham and others prior to November 14, 1972, but the first serious discussion occurred at a stockholders' meeting on January 17, 1973. After this meeting negotiations continued with several prospective purchasers until the execution of the sales contract of March 6, 1973. At no time before the concluding negotiations were the details of a sale discussed, just a sale in general terms. The agreement between Messrs. Hentzen and Burcham for the purchase of controlling interest in Fidelity stock, including that of appellants, was closed on May 30, 1973. The stock sold for $243.00 per share. Defendant Ray Pearson resold Lee Hassig's stock at a profit of $35,400.00.

Defendant Ray Pearson was employed by the bank at a modest salary. He borrowed all the money to buy the stock in question from a bank in Kansas City on a renewable short term loan, and pledged the stock as security.

The trial court found in part:

"19. Prior to the sale of Lee Hassig's stock to Ray Pearson on November 14, 1972, A. T. Pearson had never mentioned to any director or officer of Fidelity State Bank that he was considering the possibility of selling his own stock. Although A. T. Pearson had started considering the possibility of selling his stock in the latter part of July or the early part of August, 1972, due in large part to his age and physical condition, he did not resolve that doubt in favor of selling his stock until the end of December, 1972, after his 'spell' at the Terrace Club."

As to the participation by defendant Ray Pearson, the trial court found in part:

"17. At the time of the consummation of the sale of Lee Hassig's stock to Ray Pearson on November 14, 1972, Lee Hassig had never had any conversation with

Ray Pearson regarding the sale of his (Hassig's) stock. Other than his inquiry to A. T. Pearson, Hassig expressed no concern about who was buying his stock. He also never asked A. T. Pearson for his opinion with regard to the propriety of the sale of his stock or the price for which it should be sold."

"13. Prior to the above discussion [October or early November 1972] between A. T. Pearson and Lee Hassig, Ray Pearson had informed A. T. Pearson that he was interested in obtaining Lee Hassig's stock if he could obtain financing. He subsequently contacted John E. O'Conner of the First National Bank of Kansas City, Missouri, and arranged for a loan of $38,500.00 to be repaid in six months, with the understanding that the terms of the promissory note would be renewed every six months. The loan was secured by the stock Ray Pearson was purchasing, and Ray Pearson never made any reference whatsoever to Mr. O'Conner concerning a possibility of sale of the Fidelity State Bank stock, nor did he tell Mr. O'Conner of anyone having any interest in purchasing that stock, or any possibility of a resale of the stock that Ray Pearson was purchasing from Lee Hassig.

"18. Prior to the time of the sale of Lee Hassig's stock on November 14, 1972, Ray Pearson did not know that A. T. Pearson was considering selling his bank stock, although he did know that A. T. Pearson was getting to the age of retirement; he was not aware that anyone was interested in purchasing A. T. Pearson's stock; he had never talked to Mr. J. Thomas Burcham, Mr. James H. Hentzen, or any other interested purchaser; he was never present during any discussions regarding a possible sale of A. T. Pearson's stock; he was never present during, nor overheard any discussions between A. T. Pearson and Lee Hassig regarding the sale of Hassig's stock; and he had never discussed the value of either Lee Hassig's stock or A. T. Pearson's stock with anyone connected with Fidelity State Bank. In fact, the first time that Ray Pearson was ever informed that there was a possi-

bility of a sale of the controlling interest in Fidelity State Bank, was sometime during the month of February, 1973. A. T. Pearson did not advise Ray Pearson to purchase or not to purchase Lee Hassig's stock, and he did not contribute any financial support or advice whatsoever to Ray Pearson regarding Hassig's stock."

In its findings the trial court traces the general discussions between A. T. Pearson and persons who had made inquiries as to the possibility of purchasing an interest in the bank. These include the general inquiries by the representative of the group which ultimately bought the bank. This was prior to November 14, 1972. The court there found:

"36. In summary, at the time of the sale of Lee Hassig's stock on November 14, 1972, the possibility of a sale of the controlling interest of Fidelity State Bank, or even of A. T. Pearson's stock to James H. Hentzen, J. Thomas Burcham, or any other particular individuals, as well as the anticipated value and advantage of such a sale, was at best remote and speculative. Although Burcham and Hentzen had expressed a desire in purchasing controlling interest in the bank, just as many others had throughout the preceding years, the details preliminary to the consummation of a sale were never discussed except in the most general terms. Neither any specific offers nor any commitments were made, and A. T. Pearson did not even express an interest to either Mr. Hentzen or Mr. Burcham in selling his stock in the bank. In fact, A. T. Pearson did not firmly decide to sell his stock until the end of December, after his 'spell' at the Terrace Club. . . . "

The plaintiff contests the district court's decision on the grounds that there was sufficient evidence to establish liability under section 10(b) of the Securities Exchange Act and Rule 10b–5 of the Securities and Exchange Commission. He contends that (1) appellees were obligated to disclose all material information relating to the sale of his stock on November 14, 1972; (2) the Pearsons did not so disclose and made mis-

leading statements in connection with such sale; and (3) they deceived and conspired against appellant in connection with such sale. The case is basically a series of fact questions.

■ The findings of fact made by the trial court are not clearly erroneous. They are supported by substantial evidence. We have applied also the standard announced in *Williams v. Eaton,* 468 F.2d 1079 (10th Cir.), as to the evidence as a whole. The trial court resolved the few conflicts which developed in the evidence.

The evidence as a whole is a description of the steps and the progression over an extended time towards the ultimate sale of "the bank." It begins with the defendant bank president recognizing the inevitable approach of a retirement, then the intrusion of several manifestations of some sort of illness, the concern of his associates with these "spells," the decision by A. T. Pearson to sell his stock, the participation by the board of directors in a sale, and the ultimate decision that all stockholders would sell or be given a chance to sell, and the sale. The trial court, as we must do, must take out the proper segment of this progression to be examined against the assertions of the plaintiff as to what should have been revealed to him at the significant time.

The record shows that at the time the sale by plaintiff was consummated, the defendant A. T. Pearson was considering the possibility of selling his stock, which was something less than one-half of the outstanding stock. The findings show that he had not indicated to his associates that he was considering retirement. As the findings show, he was participating in the planned expansion of the bank. The persons who ultimately bought the bank had talked to him to inquire whether he would sell at all, whether a majority would sell, or whether "the bank" was for sale. He made no response to these inquiries, and "inquiries" were what they really were. The record is equally clear that it was not until somewhat later that A. T. Pearson reached a decision to sell his stock, and then the

matter rapidly developed into a sale of the bank. But, in any event, at the time the plaintiff sold his stock, the defendant A. T. Pearson was considering whether to sell his stock or not to sell it. He told the plaintiff on at least two occasions, when plaintiff sought to have his stock sold, that he, Pearson, was considering retiring and selling his stock. This may have been more than he told his business associates according to the time sequence in the record. However, as the trial court found, A. T. Pearson so advised plaintiff at the end of July or early August of 1972.

The trial court as to this incident found in part:

"... A. T. Pearson informed Lee Hassig that he was not personally interested in purchasing his stock, since he already had enough stock and control, and for the further reason that he was giving consideration to retiring and selling his stock. At that time, Lee Hassig asked A. T. Pearson if he would sell their stock together. A. T. Pearson informed Lee Hassig that he did not know anything about who any purchaser might be, or how much stock he might want; that he could only think about selling his own stock, not what someone else owned; and that he accordingly did not want any 'entangling alliance' with anybody. In addition, A. T. Pearson informed Lee Hassig that he did not know of any prospective purchasers of Hassig's stock at that time."

The significant part of this conversation is the suggestion by plaintiff that they sell their stock together. This certainly shows that plaintiff understood that A. T. Pearson "might" sell his stock. The record shows that this "might" was the then thinking of A. T. Pearson, and that no decision had then been reached whether to sell at all.

Then at the end of October or the first of November 1972, there was another contact between plaintiff and A. T. Pearson, at which time plaintiff was told that a purchaser had been found for plaintiff's stock. As to this incident, the court found in part:

"  .   .   .   A. T. Pearson again informed Hassig that he was considering selling his controlling interest in the bank. At this time, Lee Hassig asked A. T. Pearson something to the effect 'is there anything going on the bank, and A. T. Pearson responded "no." ' Due to a problem in the endorsement of the stock certificates  .   .   .   Lee Hassig did not leave his stock certificates."

Thus "again" A. T. Pearson advised the plaintiff that he was considering selling his interest in the bank. This was again at a time when nothing had been formulated, but there were possibilities for the future. It appears that this second advice to plaintiff was sufficient in the circumstances. The matters, precipitated in part by the health problems, thereafter progressed rapidly. In our view the trial court properly evaluated the "facts" as they existed at the appropriate time.

The "essential fact" was that A. T. Pearson was considering whether or not to sell. This was important, and was clearly revealed to plaintiff. This is really the only "essential" fact then existing. A. T. Pearson did not tell the plaintiff that various persons had inquired whether his stock was for sale, and that he had talked to some of these persons. This was an aspect of his consideration whether to sell. These contacts were not in any way "negotiations," but at the most were inquiries.

The matter of facts v. possibilities was touched upon in *Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514 (10th Cir.). There, at the time of the asserted nondisclosure, the financial situation of the company was under close examination, but no "facts" had been developed. There was an obvious slowdown of production. The matters then of speculation or possibility were later and soon resolved but after the event under consideration.

The case before us is similar as, from even the limited description above set out, it is apparent that the evidence supports the finding of the trier of the facts that anything more beyond that told to the plaintiff would have been conjecture and speculation as to what the future might bring. It is apparent from the record that A. T. Pearson had not made up his mind whether to sell or not at the time plaintiff sold his stock. Thus the fact that A. T. Pearson was considering selling his stock was told to plaintiff on two occasions, and this was the actual situation. The court in *Harnett v. Ryan Homes, Inc.,* 496 F.2d 832 (3d Cir.), although under somewhat different circumstances, also treats this matter of speculation as to decisions which might be made.

As mentioned, defendant A. T. Pearson did not tell the plaintiff that persons had theretofore inquired about purchase of his, A. T. Pearson's, stock. There had been these conversations, and financial statements of the bank had been given to these and other persons. The record shows that such statements were available at the bank for anyone who made inquiry about the bank, for friends of the directors and others. These statements do not appear to have any particular significance in the matter as they were readily available to a variety of persons and agencies.

What of the fact that inquiries had been made of A. T. Pearson by several persons including the ones who ultimately bought "the bank"? Was this a material fact? We do not so consider it in view of the disclosure of the basic fact that A. T. Pearson was considering selling his stock. These inquiries were an aspect of this "consideration," and were subsidiary to it. It was not an independent fact or matter nor did it, under this record, have any significance on the extent or degree of "consideration." Thus plaintiff was put on notice of the fundamental and important "fact." The Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757, said that: "The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts  .   .   ." The Court was there considering the definition of a "material fact" in a summary judgment case concerning asserted omissions

from a proxy statement under section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)). The Court there referred also to Rule 10b–5 cases decided by several courts of appeal. The Court there formulated a "general standard" for Rule 14a–9, but which appears to be equally applicable here. The standard was stated and the Court then said:

"What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

The Court was careful not to express a standard in terms of what a person "might" consider important. The Court expressly rejected the "might" element used by the appellate court. The Court in *TSC* in concluding stated its holding which is significant here. In part it said:

"We simply hold that if liability is to be imposed in this case upon a theory that it was misleading to fail to disclose purchases suggestive of market manipulation, there must be some showing that there was in fact market manipulation."

The trial court as the fact finder made the determination on the mixed question of fact and law, and applied the correct materiality legal standard.

■ The plaintiff here alleged a sequence of events which was certainly suggestive of improper dealings; however, the cause of action was not established, and the finder of the facts determined that the acts suggestive of impropriety, as in the *TSC* case, were not shown to exist.

■ It is further apparent that the plaintiff here had a burden to prove "scienter" as derived from the wording of Section 10 of the 1934 Act, " . . . to use or employ . . . any manipulative or deceptive device or contrivance in contravention of such rules . . . as the Commission may prescribe . . . " The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, has held that proof must include knowing or intentional misconduct. There was no evidence of any deceptive scheme by either of the defendants or together. The evidence shows that the defendant A. T. Pearson did not profit in any way by the transaction. Ray Pearson profited by the resale, but his prior conversations with A. T. Pearson are described in the findings, and he had no contacts with plaintiff concerning the stock sale before it was completed. Also the knowledge of Ray Pearson as to the possible sale by A. T. Pearson of his stock, and later of "the bank," is also detailed in the findings. These findings are supported by substantial evidence in the record.

AFFIRMED.