**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 11, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

EMPLOYEES' RETIREMENT SYSTEM
OF THE STATE OF RHODE ISLAND,

    Plaintiff - Appellant,

and

MICHAEL ERBER,

    Plaintiff,

v.

THE WILLIAMS COMPANIES, INC.;
WILLIAMS PARTNERS L.P.;
WILLIAMS PARTNERS GP, LLC;
ALAN S. ARMSTRONG; DONALD R.
CHAPPEL,

    Defendants - Appellees.

No. 17-5034

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:16-CV-00131-JHP-FHM)**
_____

Ira A. Schochet, Labaton Sucharow LLP, New York, New York (Joel H. Bernstein, Michael W. Stocker, Eric J. Belfi and Eric D. Gottlieb, Labaton, Sucharow LLP, New York, New York, and William B. Federman and Joshua D. Wells, Federman & Sherwood, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff-Appellant.

Sandra C. Goldstein, Cravath, Swaine & Moore LLP, New York, New York (Antony L. Ryan, Cravath, Swaine & Moore LLP, New York, New York, and Michael J. Gibbens, Elliot P. Anderson, Crowe & Dunlevy, P.C., Tulsa, Oklahoma, and Mary H. Tolbert, Oklahoma City, Oklahoma, with her on the brief), for Defendants-Appellees.

_____

Before **LUCERO**, **BALDOCK**, and **HARTZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Employees' Retirement System of the State of Rhode Island (Plaintiff) appeals the

dismissal of its amended complaint (the Complaint) in a putative class-action suit.  It

alleges violations of federal securities law because of the failure to disclose merger

discussions that affected the value of its investment.  Exercising jurisdiction under 28

U.S.C. § 1291, we affirm.  The Complaint fails to adequately allege facts establishing a

duty to disclose the discussions, the materiality of the discussions, or the requisite

scienter in failing to disclose the discussions.

## I.      FACTUAL ALLEGATIONS

Before setting forth the factual background, we should explain the sources we rely

on.  As a general rule, the only facts we consider in assessing the sufficiency of a

complaint are those alleged in the complaint itself.  *See Gee v. Pacheco*, 627 F.3d 1178,

1186 (10th Cir. 2010).  On occasion, however, it is proper to look beyond the complaint,

and this appeal presents such an occasion.  We have recognized that we may consider

"documents that the complaint incorporates by reference," "documents referred to in the

complaint if the documents are central to the plaintiff's claim and the parties do not

dispute the documents' authenticity," and "matters of which a court may take judicial

notice." *Id.* (internal quotation marks omitted).  In securities cases it is not unusual to

consider "documents incorporated by reference into the complaint, public documents

filed with the SEC [Securities and Exchange Commission], and documents the plaintiffs relied upon in bringing suit." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013). We may look to the contents of a referenced document itself rather than solely to what the complaint alleges the contents to be. *See Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007). But "such documents may properly be considered only for what they contain, not to prove the truth of their contents." *Id.* (citation and internal quotation marks omitted).

In this case, the Complaint acknowledges that its allegations derive in part from "regulatory filings with the SEC" and "press releases and media reports," Aplt. App. at A22; and it specifically cites several filings and public statements, including a press release and a transcript of a meeting with security analysts. The following summary relies for the most part on the specific allegations in the Complaint; but we supplement those allegations with additional properly referenced material, indicating when we do so.

Defendant Williams Companies, Inc. (Williams) is an energy company. At the times material to the Complaint, its president and chief executive officer (CEO) was Defendant Alan Armstrong and its chief financial officer (CFO) was Defendant Donald Chappel. Armstrong also served on its board of directors. Defendant Williams Partners GP LLC (Williams Partners GP) is a limited-liability company owned by Williams. Armstrong was chairman of the board and CEO; and Chappel was CFO and a director. Defendant Williams Partners L.P. (WPZ) is a master limited partnership, whose general partner was Williams Partners GP. Williams owned 60% of WPZ's limited-partnership units.

3

Plaintiff's case centers on merger discussions between Williams and Energy Transfer Equity L.P. (ETE), a competing energy firm. The members of the putative class purchased units of WPZ between May 13, 2015 (when Williams announced that it planned to merge with WPZ) and June 19, 2015 (when ETE announced that, despite having been rebuffed by Williams, it would seek to merge with Williams and that such a merger would preclude the merger with WPZ). The value of the units dropped significantly after this announcement. Ultimately, ETE merged with Williams and the proposed WPZ merger was not consummated. The Complaint alleges that the class members paid an excessive price for WPZ units because Williams had not disclosed during the class period its merger discussions with ETE.

Those discussions began in early 2014 when Kelcy Warren, the chairman and board of directors of LE GP, LLC, the general partner of ETE, contacted Williams' CEO Armstrong to informally express ETE's interest in exploring a merger. Armstrong said he would take any offer to the Williams board of directors. Although not alleged in the Complaint, the SEC Form S-4 registration statement filed by ETE (in connection with the ETE merger with Williams) disclosed that Armstrong told Warren that he did not believe that Williams was interested in a deal.

Nine months later, ETE conveyed another expression of interest to Williams' financial advisor Barclays Capital. Williams' board retained Barclays and legal counsel to provide guidance on ETE's interest in a merger. After a special meeting of the board in early December 2014, it decided that "it was not in the best interest of [Williams] stockholders to engage in discussions with ETE at that time," Aplt. App. at A33, although

4

it requested its management and Barclays to further study ETE (as well as other strategic opportunities). Then in January the board agreed to obtain more details about ETE's interest in a combination with Williams after completion of a pending merger between WPZ and a company called Access Midstream Partners (AMP). Accordingly, in February 2015, after the AMP merger, Defendant Armstrong reached out to Warren. Armstrong reiterated that he would convey any offer to Williams' board. The S-4 adds that Armstrong also told Warren that Williams "was not seeking a combination" but "always considers strategic proposals." *Id.* at A106.

On May 6, Armstrong and Warren met again, with Defendant Chappel and a colleague of Warren also present. The Complaint describes the meeting as ending with ETE's informal proposal to merge still "open." *Id.* at A35. The description in the S-4 is less upbeat. According to that report, the ETE representatives suggested the logic of combining Williams's natural-gas assets with ETE's diversified portfolio of energy assets and Armstrong pointed out the strength of Williams's focus on natural-gas infrastructure. Armstrong said he would discuss with his board any offer made by Warren, Warren said that ETE would not make an offer unless Armstrong supported it, and an offer from ETE was neither made nor requested.

In the meantime, Williams was pursuing a plan to acquire WPZ in full (it already owned 60% of the units). On May 12 the Williams board met with WPZ executives and advisers to discuss Williams' possible acquisition of the remainder of WPZ's outstanding units. The boards of both companies unanimously approved the merger that day and the companies entered into a merger agreement. Williams would no longer be a holding

5

company that owned shares in WPZ but instead would directly incorporate WPZ into its structure. According to the Complaint, this absorption of a master limited partnership and consolidation of its assets into a single operating entity has since been adopted by several energy-infrastructure companies—but at the time only one company had done so (about a year before Williams made its decision).

The next day, a joint press release announced the Williams-WPZ merger, Defendants conducted a presentation to securities analysts (the Analysts Presentation), and WPZ filed a Form 8-K with the SEC. The Form 8-K set forth the conditions for the merger:

> (i) the approval and adoption of the Merger Agreement and the Merger by holders of at least a majority of the outstanding WPZ [limited-partnership units]; (ii) [obtaining] all material required governmental consents . . . ; (iii) the absence of legal injunctions or impediments . . . ; (iv) the effectiveness of a registration statement on Form S-4. . . ; (v) approval of the listing on the New York Stock Exchange . . . ; (vi) the affirmative vote of the holders of the majority of the aggregate voting power present at the [Williams] Stockholder Meeting . . . ; and (vii) the affirmative vote of the holders of a majority of the outstanding shares of [Williams] Common Stock . . . .

*Id.* at A134.

At the Analyst Presentation, representatives of Williams and WPZ discussed the proposed merger and answered questions. Defendant Armstrong began his remarks with enthusiasm:

> Really glad to have everybody here today. And I have a very genuine smile on my face today as we completed I think what is a fantastic transaction for us, and really simplifying and really being—positioning us to extend the duration of the great growth trajectory we've got in front of us.

6

*Id.* at A146.  Defendant Chappel provided a detailed discussion of the proposed merger.
After describing the financial advantages of the merger and its financial projections, he
discussed the timing of the merger, stating:

> We would expect to complete and file the initial S-4 filing with the SEC
> during the month of June.  We would then work through SEC comments.
> That would go effective.  We'd have a mailing to Williams shareholders
> and then a shareholder vote and closing in the third quarter of 2015.

*Id.* at A151.  He concluded by saying that there was one condition of the merger—the
approval of those holding WPZ units—that would not be problematic:

> There's no risk around the WPZ vote because Williams has [a] majority of
> the votes, so the outcome of the WPZ vote is already known.

*Id.*  Williams also gave a slide presentation providing supplemental information regarding
the merger.  The slides made a number of cautionary remarks about the deal.  Notably, a
list of "[s]pecific factors that could cause actual results to differ from results
contemplated by the forward-looking statements," *id.* at A159, included "[s]atisfaction of
the conditions to the completion of the proposed merger, including approval by Williams
stockholders," *id.*  "Given the uncertainties and risk factors that could cause our actual
results to differ materially from those contained in any forward-looking statement,"
Williams advised investors "not to unduly rely on our forward-looking statement."  *Id*.

Less than a week after the public announcement, ETE presented a written offer to
acquire Williams.  ETE included a condition to its offer that had never been brought up in
prior discussions:  ETE would not merge with Williams if Williams merged with WPZ.
The Complaint alleges that this condition was unsurprising because ETE had never

7

strayed from holding its operating assets in master limited partnerships rather than directly—an arrangement that allegedly provided various financial advantages.

After considering the offer for a month, Williams rejected it on Sunday, June 21, sending ETE a letter explaining that ETE's proposal undervalued Williams. Also that day, Williams issued a press release announcing that it had authorized a process to explore a range of strategic alternatives following an unsolicited acquisition offer. The press release did not identify ETE as the offeror.

On Monday, ETE issued a press release disclosing its interest in merging with Williams and stating that its proposal would be a better deal for Williams' investors than the merger of Williams with WPZ. The public announcement had a significant effect on the value of WPZ units, which dropped 7.6% from the Friday close.

On September 25, Williams' board of directors voted (with Defendant Armstrong in the minority) to merge with ETE. (ETE's S-4 revealed that the board vote was 8–5.) To effectuate the merger, Williams terminated its agreement with WPZ. The Complaint includes no allegations about how the board came to accept the ETE offer during the three months from June 22 to September 25. According to a detailed and lengthy discussion in the S-4, however, Williams' board examined a variety of strategic possibilities, including mergers with a number of other companies. It narrowed its options to ETE and two other parties, both of which had proposed mergers with Williams without requiring termination of the proposed merger of Williams and WPZ.

Plaintiff filed suit on March 7, 2016. It filed the amended complaint (the Complaint) on August 31, 2016. The Complaint alleges that Defendants' failure to

8

disclose the merger discussions with ETE violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II. DISCUSSION

### A. Standard of Review and Legal Background

"We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Gee*, 627 F.3d at 1183. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Plaintiff's Complaint asserts a claim under the Securities Exchange Act, it must also satisfy the requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4. "The enactment of the PSLRA in 1995 marked a bipartisan effort to curb abuse in private securities lawsuits, particularly the filing of strike suits." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted). The statute "was intended to eliminate some of the abuses experienced in private securities litigation, such as the routine filing of lawsuits whenever there is a significant change in an issuer's stock price, the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle, and the manipulation by class action lawyers of the clients they purportedly

represent." *Id*. at 1258–59 (ellipsis and internal quotation marks omitted). With respect to pleading, the PSLRA requires that allegations of misrepresentation must satisfy a heightened standard: "[T]he complaint must 'specify each statement alleged to have been misleading, the reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which [the plaintiff's] belief is formed.'" *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108–09 (10th Cir. 2015) (quoting 15 U.S.C. § 78u-4(b)(1)(B)).

Section 10(b) of the Securities Exchange Act prohibits "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b).[1] "Rule 10b–5 implements this provision." *SEC v. Zandford*, 535 U.S. 813, 819 (2002). The rule makes it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state

---

[1] The complete language is as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

10

a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. To state a claim under Rule 10b–5, a plaintiff must allege: "(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). In addition, when the claim is for omission of a material fact, the plaintiff must show that the defendant had a duty to disclose the omitted information. *See id.* at 1125.

Liability under § 20(a) of the 1934 Securities Exchange Act is derivative of another person's liability under the Act. Section 20(a) provides that "a person who controls a party that commits a violation of securities laws may be held jointly and severally liable with the primary violator." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir. 1998) ("[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."). Because Plaintiff's claim under § 20(a) is premised on the claim that Defendants violated § 10(b), our rejection of the latter claim necessarily disposes of the former as well.

### B.    Plaintiff's Claims

Plaintiff seeks to represent purchasers of WPZ stock from May 13, 2015, through June 19, 2015. It alleges one misleading statement at the Analysts Presentation (on the

11

first day of the class period) and one omission of a material fact at that time. The alleged misleading statement was that the Williams-WPZ merger was a done deal, there being "no risk" that it would not be consummated. The alleged omission was the failure to disclose that Williams and ETE had been having discussions about a potential merger that would prevent the WPZ merger. Plaintiff contends that as a result of Defendants' alleged deception, the members of the putative class overpaid for units in WPZ, as shown by the sharp drop in the value of those units when ETE's merger discussions with Williams were eventually announced on June 22 (the first business day after the class period).

The district court properly dismissed the claim based on the alleged misleading statement because the allegation is based on a mischaracterization of what Defendants said. As for the alleged material omission, we affirm on three grounds: (1) Defendants had no duty to disclose the merger discussions with ETE; (2) even if there was a duty to disclose, Plaintiff failed to adequately allege that the discussions were material; and (3) even if Defendants had a duty to disclose and the discussions were material, Plaintiff failed to adequately allege that Defendants possessed the requisite scienter when failing to disclose the merger discussions.

### 1)      The Alleged No-Risk Statement

Plaintiff asserts that the prospect of a merger of Williams with ETE placed the consummation of the Williams-WPZ merger in doubt, yet Defendants publicly announced at the Analysts Presentation that the Williams-WPZ merger was a done deal, even going so far as to say that the Williams-WPZ merger was a "no-risk" proposition.

12

In support of this contention, the Complaint alleges that Defendants referred to the merger in the past tense, announcing that the merger was a "transaction [that Williams and WPZ] just got done," one that had already been "completed" and "finished." Aplt App. at A46–47. According to Plaintiff, "Reasonable investors would understand . . . [these statements to mean that] the conditions for [completion of the Williams-WPZ merger] were mere formalities . . . [and] that Defendants were unaware of any material risk to consummation of the merger." Aplt. Reply Br. at 13.

A reasonable person, however, would not interpret Defendants statements at the Analysts Presentation as saying more had happened than had actually happened. After all, a lot *had* happened. Those who ran the affairs of Williams and WPZ had agreed on a detailed plan to merge the two entities. When Defendants spoke in the past tense, they were clearly referring to what had been agreed upon. They were not saying, as Plaintiff would have it, that the merger had been consummated. On the contrary, they made quite explicit what further steps were necessary.

And, contrary to Plaintiff's assertion, no one said that "there existed no *present* facts—'no risk'—that posed a danger of an adverse result." Aplt. Br. at 47. Defendants noted a number of factors that could prevent their predictions from coming true and cautioned investors "not to unduly rely on our forward-looking statement." Aplt. App. at A159. Plaintiff misleadingly extracts the "no risk" comment from a statement Defendant Chappel made about the steps that needed to be taken to effectuate the merger. Chappel closed his remarks at the Analysts Presentation by stating that Williams was expecting to (1) "complete and file the initial S-4 filing with the SEC during the month of June";

13

(2) "work through SEC comments"; and then (3) "have a mailing to Williams shareholders and then a shareholder vote and closing in the third quarter of 2015." *Id.* at A151. He then stated: "There's *no risk around the WPZ vote* because Williams has [a] majority of the votes, so the outcome of the WPZ vote is already known." *Id.* (emphasis added). Chappel did not state that any other element of the merger was guaranteed. Indeed, by pointing out that one element was "no risk," he was implying that there *was* a risk with respect to each of the other elements.

In short, the Complaint does not adequately allege that Defendants falsely communicated that the WPZ merger would certainly take place.

### 2) Failure to Disclose Merger Discussions with ETE

Among the elements of a claim under Rule 10b-5 for failure to disclose are (1) that the defendant had a duty to disclose the information, (2) that the undisclosed information was material, and (3) that the defendant acted with the requisite scienter. *See Grossman*, 120 F.3d at 1118, 1125. In our view, the Complaint failed on each of these elements. It did not adequately allege that Defendants had a duty to disclose the merger discussions, that the discussions were material, or that Defendants acted with the requisite scienter. We start with duty.

### a. Duty to Disclose at Time of Announcement of WPZ Merger

Defendants had no duty under the securities laws to disclose the merger talks with ETE when it announced the planned Williams-WPZ merger, even if the existence of such talks was material information. Rule 10b–5 does "not create an affirmative duty to

14

disclose any and all material information. Disclosure is required under [the Rule] only when necessary to make statements made, in the light of the circumstances in which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (ellipsis and internal quotation marks omitted); *see McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it *alters the meaning of the statement*." (emphasis added) (brackets and internal quotation marks omitted)). "[S]ilence, absent a duty to disclose[,] cannot serve as the basis for liability under Rule 10b–5." *Grossman*, 120 F.3d at 1125 (internal quotation marks omitted). And "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *Chiarella v. United States*, 445 U.S. 222, 235 (1980).

Defendants made no statement about the prospects of Williams merging with any other companies when the Williams-WPZ merger was announced. There was therefore no need to disclose the discussions with ETE "to make . . . statements made, in the light of the circumstances in which they were made, not misleading." *Matrixx*, 563 U.S. at 44. Two opinions of other circuits support, and illustrate, the proposition.

In *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997 (9th Cir. 2002), the plaintiffs had sold shares in the defendant company after the company issued a press release describing its plans to buy back hundreds of thousands of its shares. The plaintiffs complained that the press release had not also disclosed that other companies had submitted proposals to acquire the defendant (which presumably would have increased the value of the shares). *See id.* at 999, 1006–07. The Ninth Circuit rejected

15

the plaintiffs' contention that "once a disclosure is made, there is a duty to make it complete and accurate." *Id.* at 1006 (internal quotation marks omitted). "This proposition," said the court, "has no support in the case law." *Id.* Rule 10b–5 "prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Id.* "To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* To require that statements be "complete" would be to impose an excessive burden since "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* The court concluded that plaintiffs had no claim: "If the press release had affirmatively intimated that no merger was imminent, it may well have been misleading. The actual press release, however, neither stated nor implied anything regarding a merger." *Id.*

The Second Circuit reached the same conclusion in *Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992). The defendant corporation issued two press releases on the same day, announcing that it was rejecting the offer of a leveraged buyout from the plaintiffs but would consider "any legitimate acquisition proposal." *Id.* at 152. Not mentioned in the releases was that the company had already begun meeting with other companies and investment banks to discuss being acquired. *See id.* at 151–52. One of these discussions ripened into a leveraged-buyout (LBO) agreement. *See id.* By that time, however, the plaintiffs had already sold their shares in the defendant at a substantially lower price than the ultimate acquisition price. They filed suit, claiming

16

that the defendant corporation intentionally withheld information about buyout negotiations in order to depress its stock and to deter other acquirers. *See id.* at 153. The Second Circuit concluded that the corporation did not have a duty to disclose its negotiations with the investment banks and other companies. *See id.* at 157. "[T]he mere fact that exploration of merger or LBO possibilities may have reached a stage where that information may be considered material does not, of itself, mean that the companies have a duty to disclose." *Id.* Other than its two press releases, the corporation made no other public statements about its merger discussions. *See id.* Its conduct was entirely consistent with the press releases it did issue. It alerted the public that it would consider any serious merger proposal, and its private negotiations with an investment bank were consistent with that announcement. *See id.*

Likewise, none of the Defendants in this case said anything at the Analysts Presentation that was inconsistent with Williams having received overtures from ETE. They spoke only about the merger in which Williams would absorb WPZ. They did not mention other potential transactions that might occur—or that it had conducted, or had not conducted, merger discussions with other firms. In particular, they did not state that the Williams-WPZ deal would be exclusive of any other merger. What they did say did not create a duty to disclose conversations with ETE. Disclosing that Defendants had engaged in talks with ETE would not "alter[] the meaning" of any of the statements made about the Williams-WPZ deal. *McDonald*, 287 F.3d at 998.

Plaintiff contends that our decision in *Hassig v. Pearson*, 565 F.2d 644, 646 (10th Cir. 1977), establishes that Defendants had a duty to disclose the possibility of a merger.

17

The plaintiff in *Hassig* owned stock in a local bank whose shares were closely held. *See id.* at 645. He apparently had sought business counseling on occasion from the defendant, who was president of the bank and, with his wife, owned about half the shares. *See id.* Over the course of several years, he had discussions about the possibility of selling his shares with the defendant. *See id.* at 645–46. In May or June of 1972, when the plaintiff told the defendant that he wished to sell his stock for $125 a share, the defendant expressed no opinion on the value but said that he was not interested "because he had control, and was giving consideration to retiring and selling his own stock." *Id.* at 646. A few months later the plaintiff asked the defendant if he knew of a buyer and said he was anxious to sell his stock. *See id.* In November the defendant, who again mentioned that he was considering selling his interest in the bank, said he knew of a buyer, and the plaintiff sold his shares. *See id.* The defendant suffered some medical problems the next month, precipitating his agreement to seriously consider selling the shares. *See id.* The sale was consummated in March 1973, shortly after the parties settled on the details of the transaction, including the price of $243 per share. *See id.* Our opinion describes as an "essential fact" that the defendant was considering whether or not to sell his shares in the bank when the plaintiff had a conversation with him about selling the plaintiff's shares. *Id.* at 649 (internal quotation marks omitted). But Plaintiff reads too much into that statement. Our opinion says nothing about duties to disclose; and there was no need to determine whether the defendant had a duty to disclose his intent to sell (or even the materiality of that intent), because there was no dispute that this had in fact been disclosed. Moreover, we affirmed a judgment in favor of the defendant.

18

*See id.* at 650.  Thus, the language of *Hassig* relied on by Plaintiff is, at best, dictum confined to a specific, unusual fact situation.  It would be a stretch too far to say that *Hassig* stands for the proposition that there is always a freestanding duty to disclose the possibility of a merger (or other disposition of the controlling interest of a company).

Plaintiff alternatively contends that Defendants had a duty to disclose the ETE discussions because their assertion at the Analysts Presentation that the WPZ merger was a done deal was a material statement that was misleading in the absence of disclosure of the merger conversations with ETE.  But as already explained above, Defendants made no such assertion.  On the contrary, they described a number of conditions that had to be satisfied for the merger to take place and they made several cautionary statements.  The only condition of the merger described as "no risk" was the vote of approval by WPZ, which was controlled by Williams.

The case before us is readily distinguishable from another case relied upon by Plaintiff, *Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015).  The defendants in that case misled investors regarding the value of a company when it was announced that a deal to purchase a large share of the company's core asset had fallen through.  The announcement said that "[w]hile [the other company] was unable to arrange financing for the transaction on terms acceptable to us, we remain confident in the value of our . . . asset."  *Id.* at 1147 (internal quotation marks omitted).  Omitted from the announcement was that the reason the purchaser had backed out was that it had decided that the asset was worth far less than the purchase price.  *See id.* at 1148.  Thus, the announcement gave a misleading account of why the deal had not been consummated.  This is in stark

contrast to the case before us, where nothing was communicated by Defendants at the Analysts Presentation that was inconsistent with there having been merger conversations between Williams and ETE.

### b. Duty to Update Defendants' Statements

Plaintiff argues in the alternative that even if Defendants were not required to disclose any information about Williams' discussions with ETE during the mid-May Analysts Presentation, they were required to update their disclosures a few days later when ETE made a formal proposal to Williams. Whether there is ever such a duty to update is uncertain. We suggested the possibility when we once stated that if a defendant's statement "later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement." *Grossman*, 120 F.3d at 1125. Other circuits are divided. *Compare Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1317–18 (11th Cir. 2014) (defendant, which had a 162-year history as a private firm and had previously made statements that it would "continue to be privately held," had a duty to update by disclosing that it had begun merger negotiations), and *United States v. Schiff*, 602 F.3d 152, 170 (3d Cir. 2010) (concluding that a "narrow" duty to update may arise when a company makes an initial statement that concerns "fundamental changes" in the nature of the company and "subsequent events produce an extreme or radical change in the continuing validity of that initial statement" (emphasis, brackets, and internal quotation marks omitted)), *with Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("We do not have a system of continuous disclosure." ); *id.* at 810 ("[A] statement may be 'corrected' only if it was *in*correct when made . . . .").

20

We need not decide this issue today. Even if there is a duty to update in some circumstances, there was no duty here. Defendants would have a duty to disclose ETE's formal proposal only if they had said something at the Analysts Presentation that was rendered false by the ETE proposal. But they had not. Their statements were consistent with the possibility that the WPZ merger would have to be cancelled because of a future event, such as a merger with an outside entity. That this possibility was now more likely would affect the materiality analysis, but not the existence of a duty.

          c.       **Materiality of Williams' Early Discussions with ETE**

We also hold that the existence of the early merger discussions was not material information. Information is material "only if a reasonable investor would consider it important in determining whether to buy or sell stock." *Slater*, 719 F.3d at 1197 (internal quotation marks omitted).

Whether the prospect of a merger is material information has been an important recurring issue in federal court. The Supreme Court addressed the issue in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Although the defendant, Basic, had been in merger discussions with a competitor for two years, it had made three public statements during that period in which it denied that it was engaged in merger negotiations. *See id.* at 227. It then suspended trading in its shares, issued a public announcement that it had been approached by another company concerning a merger, and accepted the competitor's merger offer the next day. *See id.* at 227–28. The plaintiffs, who had sold their stock during the two-year period in which Basic had denied engaging in merger discussions,

21

accused Basic of making misleading statements to depress its stock price. *See id.* at 228–29.

The Supreme Court noted that the "application of [the] materiality standard to preliminary merger discussions is not self-evident." *Id.* at 232. It said that when an "event is contingent or speculative in nature, it is difficult to ascertain whether the 'reasonable investor' would have considered the omitted information significant at the time," and that "[m]erger negotiations, because of the ever-present possibility that the contemplated transaction will not be effectuated, fall into [that] category." *Id.*

Before presenting the proper approach, the Court rejected two bright-line tests for evaluating the materiality of merger discussions. One was the "agreement in principle" test, which limited disclosures by holding that merger negotiations "by definition" could not be material if the parties had not agreed on the price and structure of the transaction. *Id.* at 233. The test had three policy justifications: avoiding overwhelming investors with excessive information, preserving confidentiality of merger discussions, and providing a clear rule for determining when disclosure is appropriate. *Id.* The Court was not persuaded. It rejected the notion that merger discussions were so inherently tentative and risky that requiring disclosure of *any* preliminary discussions could mislead investors. *See id.* at 234. The materiality requirement was designed to "filter out essentially useless information," not to assume that investors have a "child-like simplicity" and are unable to grasp the "probabilistic significance of negotiations." *Id.* As for a corporation's need to keep preliminary discussions confidential, "[t]he 'secrecy' rationale is simply inapposite to the definition of materiality," and is "more properly

considered under the rubric of an issuer's duty to disclose." *Id.* at 235.  Finally, the Court stressed that while any bright-line rule for materiality would be easier to follow, "ease of application alone is not an excuse for ignoring the purposes of the Securities Acts." *Id.* at 236.  Determining materiality "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences." *Id.* (citations and internal quotation marks omitted).  Any rule "that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive." *Id.*

The second bright-line test rejected by the court was that merger discussions are automatically material if the company has denied their existence.  *See id.* at 237.  But that test fails to recognize that materiality is an element of the claim *in addition to* falsity.  To be actionable under Rule 10b-5, a statement must be "*misleading* as to a *material* fact.  It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Id.* at 238.

After rejecting these bright-line rules, the Supreme Court adopted the "probability/magnitude" test for determining when preliminary merger discussions are material.  *Id.*  Under this test the courts analyze the probability that a merger will succeed and the magnitude of the transaction.  *See id.* at 240.  The inquiry is fact-specific.  *See id.*  "[T]o assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels," such as "board resolutions, instructions to investment bankers, and actual negotiations between

23

principals or their intermediaries." *Id.* at 239. The magnitude of a transaction may be indicated by "the size of the two corporate entities" and "the potential premiums over market value." *Id.* The Court stressed that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." *Id.* The Court remanded the case for reconsideration under the proper materiality standard.

Two decisions by fellow circuits illustrate that merger discussions are generally not material in the absence of a serious commitment to consummate the transaction. In *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 415 (1st Cir. 1989) (Breyer, J.), the First Circuit affirmed a directed verdict because no reasonable juror could conclude that the preliminary merger plans and negotiations were material. The defendant, Hospital Trust, had begun considering a merger with a competitor. Senior management had described the Trust as an attractive "takeover candidate," it received at least two expressions of interest from other banks, some of its officials had expressed the view that it needed four times its present assets to survive, and its general counsel had prepared a position paper and recommended acquiring outside services relating to a possible merger. *Id.* at 413–14. But those facts did not make the discussions material. "For one thing," said the court, "the evidence shows no more than the type of concern about possible acquisition that many large companies frequently express; it reveals *no concrete offers*, *specific discussions, or anything more than vague expressions of interest*." *Id.* at 415 (emphasis added). The court explained: "For large corporations to make public announcements every time directors discuss any such matter in terms as vague as those

24

presented in this evidence or receive 'tentative feelers' of the general sort revealed by this evidence would more likely confuse, than inform, the marketplace." *Id.* (citations omitted).

A similar analysis and conclusion appears in *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244 (4th Cir. 1988). Two banks in separate states discussed the possibility of a merger across state lines if such mergers became lawful. *See id.* at 242. At the time, the Supreme Court was considering in *Northeast Bancorp, Inc.*, *v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 178 (1985), whether interstate banking was legal. *See Taylor*, 857 F.2d at 242–43. The Fourth Circuit concluded that the merger discussions were too "preliminary, contingent, and speculative" to be considered material. *Id.* at 244. The parties had not agreed to the price or structure of the merger, and there was "no evidence of board resolutions, actual negotiations, or instructions to investment bankers to facilitate a merger." *Id.* at 244–45. The court cautioned that "[t]hose in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement," and "[n]ot every such business conversation gives rise to legal obligations." *Id.* at 244 (citations omitted). "The materiality of information concerning a proposed merger is directly related to the likelihood the merger will be accomplished; the more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision." *Id.* at 244–45. "To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to bury the shareholders in an avalanche of trivial information;

25

the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid." *Id.* at 245 (internal quotation marks omitted).

Guided by these decisions, we readily conclude that Williams' talks with ETE before May 12 were not material. Plaintiff must allege facts showing the likelihood of both a Williams-ETE merger and a substantial impact on WPZ unitholders resulting from a merger. The Complaint fails in both respects.

First, the Complaint does not plausibly allege that a Williams-ETE merger was likely when the Analysts Presentation statements were made. It mentions conversations and the willingness of Williams' executives to convey offers to its board. But it fails to allege any "concrete offers, specific discussions, or anything more than vague expressions of interest." *Jackvony*, 873 F.2d at 415. Although it alleges that the Williams' board began examining strategic opportunities, it does not allege that this examination focused on just ETE or even just mergers. Nothing alleged in the Complaint contradicts, or is even inconsistent with, (1) the assertion in the S-4 that Armstrong's statement in response to the first overture in early 2014 was that "he did not believe [Williams] was interested in a combination," Aplt. App. at A105; (2) Armstrong's repetition of that statement on February 13 and March 2, 2015—telling ETE that Williams "was not seeking a combination," *id*. at A106; (3) the statement in the S-4 that the dinner meeting in May 2015 ended without any offer being made by ETE or any request for an offer made by Williams, *see id.*; or (4) the statement in ETE's press release of June 22, 2015, that up until then "Williams' management has inexplicably ignored ETE's efforts to engage in a discussion with Williams regarding a transaction that

26

presents a compelling value proposition for its stockholders," *id.* at A177–78.[2]  It is not enough that the allegations of the Complaint are "merely consistent with" there being a serious commitment to merge the two companies.  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  The allegations here are fully consistent with there being no commitment whatsoever.

In addition, merger discussions between Williams and ETE would be material information to WPZ investors only if they thought that the merger would substantially affect the value of WPZ units.  The Complaint suggests that investors would be concerned about an ETE merger because it would require termination of the merger between Williams and WPZ.  But it does not allege that ETE had ever indicated before the Analysts Presentation that it could not tolerate the WPZ merger.  The Complaint simply notes some advantages of retaining WPZ as a master limited partnership and points out that only one major energy company had chosen to consolidate in that manner, having done so in 2014.  But as Williams pointed out at the Analysts Presentation, there can also be advantages to consolidation, the advantages and disadvantages depend on the particular circumstances of the master limited partnership, consolidation of WPZ with Williams looked advantageous at that time, and Williams might create or acquire other

---

[2]  The second sentence of the Complaint states:  "Lead Plaintiff's information and belief is based upon counsel's investigation, which includes review and analysis of: (a) regulatory filings with the [SEC]; (b) press releases and media reports; (c) securities analyst reports; (e) [sic] other public information; and (f) analysis of the foregoing by a consulting expert."  Aplt. App. at A22.  It appears that the Plaintiff's allegations regarding the discussions between ETE and Williams are founded on the S-4 and ETE's press release.  We think it ironic that Plaintiff has built its failure-to-disclose-material-information allegations on statements cherry-picked from these documents, which present a quite different picture when read in their entirety.

27

master limited partnerships in the future. Although the Complaint suggests reasons why ETE might look unfavorably on the WPZ merger if it were to combine with Williams, it only speculates that WPZ investors would reasonably view such a combination as fatal to the WPZ merger.

In short, under the probability/magnitude test the allegations of the Complaint do not present a plausible claim that the existence of merger conversations between Williams and ETE before the Analysts Presentation was a material fact to WPZ unitholders.

Plaintiff cites *Castellano v. Young & Rubicam, Inc*., 257 F.3d 171 (2d Cir. 2001), in support of its materiality argument. But that case is distinguishable on two grounds. First, the merger discussions in *Castellano* were significantly further advanced than in our case. Second, and perhaps more importantly, what was material in that case was that there had been *any* serious efforts to restructure the closely held company, whereas in this case Plaintiff was not concerned about any old merger but only a merger with ETE– because that was the only merger that could undercut the WPZ merger.

In *Castellano* the plaintiff was an executive and one of the largest shareholders of the defendant, a privately held advertising agency. *See id.* at 174–75. The other shares were held only by a select group of employees, and no one could sell or transfer shares without first offering them to the company. *See id.* at 175. The company had a falling out with the plaintiff. *See id.* at 174–75. It could force his ouster but only on one year's notice, so it was trying to persuade him to resign. *See id.* at 175, 180. If a shareholder's employment ended, the company could purchase the shares for their book value at the

28

end of the prior year, which was approximately the company's net income per share for that year. *See id.* at 175. The final sticking point in the departure negotiations was settling on the terms for buying the plaintiff's stock. *See id.* One of his concerns was that his retirement would cause him to "lose the opportunity to profit as an equity holder if [the company] went public." *Id.* In response, the company "assured him [it] was not going to go public and that nothing was going to change in the near future." *Id.* (internal quotation marks omitted). But he still insisted, and received, some protection if the company went public in the next 20 months and the value of the shares increased above book value. *See id.* Plaintiff resigned on April 1, 1996. *See id.*

What plaintiff was not told is that the company had been engaged in serious negotiations to restructure the company. In August 1995 the company had commenced merger negotiations with a publicly traded competitor. *See id.* at 176. The company hired an investment banker to assist, but the two companies were unable to come to terms, and negotiations ended in late 1995. *See id.* During this same period the company was also consulting with the same investment banker to evaluate the possibility of having an initial public offering (IPO) to become a publicly traded company. *See id.* In mid-December the investment banker advised against an IPO but suggested a leveraged recapitalization and arranged a meeting in early 1996 with an LBO firm. *See id.* The firm and the company entered into a confidentiality agreement, and they retained outside accountants and lawyers to conduct due diligence. *See id.* at 184. Executives of the company had daily meetings for several weeks to discuss the transaction. *See id.* In March 1996 the LBO firm told the company it was "considering a transaction that would

price [the company's] equity at double its current book value"; but the investment banker reported on March 31 (the day before the plaintiff resigned) that its analysis suggested that the shares should be worth even more. *Id.* at 176. When the LBO firm formally offered the proposal, the company rejected it as inadequate. *See id.* Negotiations with another LBO firm began in June, and in August 1996 the company reached an agreement with that firm that gave the company's shareholders 2.4 times the book value per share received by the plaintiff. *See id.*

The Second Circuit held that a jury could properly determine that these prior negotiations, even though unsuccessful, were material. The discussions about a merger could be found to demonstrate that the "company's intention to merge or undertake other restructuring has moved beyond its incipient stages and ripened into purposeful action, and that the company has been a plausible merger candidate in the judgment of at least one potential partner," which would "significantly alter[] the total mix of information available," particularly when this would have been the first occasion that the company "had ever considered transferring equity to an outsider." *Id.* at 182. As for the discussions with the leveraged-buyout firm, they were also material given the magnitude of the transaction ("potentially leading to a doubling or tripling of the value of [shareholders'] holdings") and the seriousness of the company's involvement, including the "intense attention" of the company's executives, its "engagement of law firms and investment bankers, and the parties' entrance into a confidentiality agreement and extensive due diligence." *Id.* at 185.

*Castellano* is at best a distant relative of this case. The merger and leveraged-buyout discussions in *Castellano* were much more advanced than the brief, informal conversations and communications between ETE and Williams before the Analysts Presentation, which involved no confidentiality agreements, no exchanges of financial information, and no offers. And even Williams' general interest in hearing proposals for strategic opportunities was of little relevance to Plaintiff. Plaintiff's concern was having the WPZ merger consummated, and the only threat to consummation that it has identified among the possible strategic opportunities was a merger with ETE.

We also quickly dispose of Plaintiff's contention that our opinion in *Hassig*, 565 F.2d 644, supports its materiality argument. Our analysis of duty earlier in this opinion discussed *Hassig* at some length. We repeat that one should not read too much into dictum in that case, particularly when we conducted no probability/magnitude analysis. Suffice it to say that *Hassig* does not require us to depart from the above analysis of materiality in this case.

### d. Scienter

Even if there was a duty to disclose and the challenged statements were material, the Complaint suffers from another fatal defect: it fails to adequately allege that Defendants acted with the requisite scienter—"intent to defraud or recklessness." *Grossman*, 120 F.3d at 1118. We have defined *recklessness* in this context as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Fleming*, 264 F.3d at 1260.

31

The PSLRA imposes a heightened pleading standard for scienter. "It is not sufficient for a plaintiff to allege generally that the defendant acted with scienter . . . . Rather, the plaintiff must, 'with respect to each act or omission . . . , state with particularity facts *giving rise to a strong inference* that the defendant acted with the required state of mind.'" *Gold Res. Corp.*, 776 F.3d at 1109 (quoting 15 U.S.C. § 78u–4(b)(2)(A)) (emphasis added). We consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

In assessing Defendants' scienter we look only to material facts "reasonably available" to them by the time of the Analysts Presentation. *Fleming*, 264 F.3d at 1260. "Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price)." *Id.* (internal quotation marks omitted). "In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*." *Id.* (internal quotation marks omitted).

Plaintiff claims that Defendants acted with scienter when they failed to disclose ETE's overtures because they knew or recklessly disregarded the risk that (1) the Williams-ETE merger would be approved and (2) a Williams-ETE deal would gravely endanger the Williams-WPZ deal. We are not persuaded.

32

First, as explained above in the discussion of materiality, Plaintiff's allegations fall far short of establishing that it was likely that a merger with ETE would occur and would put a kibosh on the WPZ merger. Given the small likelihood that the ETE contacts posed a risk to the WPZ merger, one can hardly draw a "strong inference" that Defendants intended to deceive investors by failing to disclose those contacts publicly or that Defendants knew or must have been aware (because the conclusion was so obvious) that a failure to disclose would mislead investors.

Second, Plaintiff's allegations of scienter are unpersuasive because the Complaint fails to allege any plausible motive why Defendants would wish to mislead investors about the prospects of the Williams-WPZ deal. Although the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1347 (10th Cir. 2012). The Complaint suggests no reason (other than a desire not to waste everybody's time) why Williams would not wish to disclose at the Analysts Presentation that ETE had made overtures to Williams about a merger and that the WPZ merger would be inconsistent with ETE's business model at the time. Indeed, if Williams thought there was a substantial likelihood that the WPZ merger would not go through, what would be its motive to press forward on the transaction? The fact that it did press forward creates a "strong inference" that it did not think the ETE overtures would lead to termination of the consolidation, not a strong inference of the scienter that Plaintiff needs to establish.

Plaintiff's opening brief suggests that the Williams executives had a motive to conceal the Williams-ETE merger discussions because their own jobs were at stake. But

this self-interest is not alleged in the Complaint, so we decline to address the suggestion, which probably lacks merit anyway. *See Fleming*, 264 F.3d at 1270 ("Allegations that merely charge that executives aim to prolong the benefits they hold are, standing alone, insufficient to demonstrate the necessary strong inference of scienter. For this reason assertions that a corporate officer or director committed fraud in order to retain an executive position simply do not, in themselves, adequately plead motive." (ellipsis and internal quotation marks omitted)).

We hold that the Complaint fails to adequately allege scienter.

## III. CONCLUSION

We **AFFIRM** the district court's judgment.