**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARK E. SCHELL,

     Plaintiff - Appellant.

v.

THE CHIEF JUSTICE AND JUSTICES
OF THE OKLAHOMA SUPREME
COURT; THE MEMBERS OF THE
OKLAHOMA BAR ASSOCIATION'S
BOARD OF GOVERNORS; JOHN M.
WILLIAMS, Executive Director,
Oklahoma Bar Association, all in their
official capacities,

     Defendants - Appellees.

No. 20-6044

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:19-CV-00281-HE)**
_____

Anthony J. Dick, Jones Day, Washington, D.C. (Jacob Huebert and Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix Arizona; and Charles S. Rogers, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff -Appellant.

Daniel Volchok, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C. (Michael Burrage, Whitten Burrage, Oklahoma City, Oklahoma; Thomas G. Wolfe and Heather L. Hintz, Phillips Murrah P.C., Oklahoma City, Oklahoma; Kieran D. Maye, Jr. and Leslie M. Maye, Maye Law Firm, Edmond, Oklahoma, on the briefs), for Defendants – Appellees.

_____

Before **HARTZ**, **EBEL**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Mark E. Schell, an attorney, asked the district court to invalidate Oklahoma's requirement that practicing attorneys join the Oklahoma Bar Association ("OBA") and pay mandatory dues. In addition, Mr. Schell alleged that the OBA did not utilize adequate safeguards to protect against the impermissible use of funds.

Initially, the district court dismissed Mr. Schell's challenges to membership and dues but permitted Mr. Schell's challenge to the OBA's spending procedures to proceed. Then, the OBA adopted new safeguards consistent with Mr. Schell's demands. The parties agreed the revised safeguards mooted Mr. Schell's remaining claim and asked that the district court dismiss the Amended Complaint. The district court obliged, and this appeal, limited to the membership and dues requirements, followed.

On appeal, Mr. Schell, primarily citing *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), disputes whether Supreme Court precedents upholding bar membership and mandatory dues remain good law. His view is that *Janus* transformed prior Supreme Court decisions upholding mandatory bar dues and membership such that what was once permitted by *Lathrop v. Donohue*, 367 U.S. 820 (1961), and *Keller v. State Bar of California*, 496 U.S. 1 (1990), is now precluded.

2

We affirm the district court's holding that mandatory bar dues do not violate Mr. Schell's First Amendment rights. Throughout that portion of our analysis, we apply an overarching principle: "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). As for Mr. Schell's First Amendment claim based on mandatory bar membership, we hold the majority of the allegations supporting this claim occurred prior to the controlling statute-of-limitations period. However, some of the allegations falling within the statute-of-limitations period allege conduct by the OBA not necessarily germane to the purposes of a state bar as recognized in *Lathrop* and *Keller*. Accordingly, the district court erred by relying upon *Lathrop* and *Keller* to dismiss Mr. Schell's freedom of association claim based on mandatory bar membership. We therefore reverse the district court's dismissal of Mr. Schell's freedom of association claim based on mandatory bar membership, and we remand so that Mr. Schell may conduct discovery on that claim.

## I.  BACKGROUND

### A.  *Factual History*

**1.  The OBA**

The Supreme Court of Oklahoma created the OBA, dubbed it "an official arm" of the Court, and promulgated rules governing its operations. Okla. Stat. tit. 5, ch. 1,

3

app. 1, art. I, § 1. The OBA is governed by a seventeen-person Board of Governors, all of whom must be OBA active members. *Id.* art. IV, § 1. The Board of Governors selects an Executive Director and approves the disbursement of OBA funds. *Id.* art. VI, § 1; art. VII, § 2.

As relevant here, the OBA's membership consists of "those persons who are, and remain, licensed to practice law in" Oklahoma. *Id.* art. II, § 1. Persons who are not OBA active members may not practice law in Oklahoma, subject to narrow exceptions. *Id.* §§ 5, 7. OBA members must pay annual dues. *Id.* art. VIII, § 1. If a member fails to pay dues, the Board of Governors is required to refer that person to the Supreme Court of Oklahoma for suspension from the practice of law. *Id.* § 2. Mr. Schell has paid annual dues to the OBA for decades.

## 2. OBA Speech

Mr. Schell, through his Amended Complaint, alleges "[t]he OBA uses members' mandatory dues to engage in speech, including political and ideological speech." App. at 27. In accord with provisions of the OBA bylaws, the OBA formally engages in three types of legislative activity. First, the OBA operates a "Legislative Program" entity which "may propose legislation 'relating to the administration of justice; to court organization; selection, tenure, salary and other incidents of the judicial office; to rules and laws affecting practice and procedure in the courts and in administrative bodies exercising adjudicatory functions; and to the practice of law.'" *Id.* (quoting art. VIII, §§ 2, 3 of the OBA Bylaws). Second, the OBA is authorized to make recommendations on pending legislation impacting the same items on which

4

the "Legislative Program" entity may draft proposed legislation. Third, the OBA is permitted to "endorse 'any proposal for the improvement of the law, procedural or substantive . . . in principle.'" *Id.* (quoting art. VIII, § 4 of the OBA Bylaws) (alteration in original).

Mr. Schell's Amended Complaint identifies two examples of the OBA's direct legislative activity. First, in 2009, "the OBA publicly opposed a controversial tort reform bill." *Id.* Second, in 2014, the OBA created a petition and organized a political rally at the Oklahoma State Capitol in opposition to proposed legislation changing the process for the selection of members to the Oklahoma Judicial Nomination Commission. The Amended Complaint further alleges the OBA, through its committees, continues to draft, support, and oppose legislation.

The OBA also publishes the *Oklahoma Bar Journal*. Mr. Schell alleges, "[t]he OBA uses mandatory member dues to publish political and ideological speech in its *Oklahoma Bar Journal* publication." *Id.* at 28. Mr. Schell's Amended Complaint identifies several articles published in 2016 touching on matters such as the Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), regulation of the oil and gas industry, the influence of monetary contributions on the judicial selection process, tribal law issues, and climate change. Mr. Schell contends these articles were political and ideological in nature, rather than merely informative. For instance, the article discussing *Citizens United* criticized the Supreme Court for "changing the United States 'to "a government of the corporations, by the bureaucrats, for the money."'" *Id.* at 28 (quoting the OBA article). Meanwhile, articles on the oil and gas

5

industry (1) called for increased regulation of injection wells, (2) praised Al Gore for his stances on climate change and against fossil fuels, (3) praised an author who accused the industry of using "big money" to "takeover" government, and (4) urged OBA members to "take action" and stand up against the oil and gas industry's takeover of the government. *Id.* at 29. And an article discussing tribal law accused the state attorney general of advancing arguments before the United States Supreme Court that were "'disingenuous' and the product of 'uninformed bias.'" *Id.* (quoting May 2016 *Oklahoma Bar Journal* article entitled "State Attorney General Argues Against Tribal and State Interests"). Additionally, articles called pending legislation regarding the judicial selection process an attack on the OBA and the Oklahoma courts, with one article entitled "We Don't Want to Be Texas." *Id.*

Mr. Schell also alleges the September 2016 publication of the *Oklahoma Bar Journal* included an announcement of a speech hosted by the OBA, a speech scheduled to take place one week before the 2016 general election. Mr. Schell avers the advertisement indicated the keynote speaker planned to speak about the influence of money in the judicial system and how "wealthy conservative libertarians" intended to use contributions to "chang[e] the way the law is taught in law schools" and to "pay[] for judicial junkets." *Id.* at 30.

Finally, the Amended Complaint contains several allegations about articles published in the *Oklahoma Bar Journal* from 2017 through 2019. First, it alleges an April 2017 article "criticized legislative proposals to change Oklahoma's method of judicial selection, suggesting that, if they passed, 'big money and special interest

6

groups [would] elect judges and justices and campaign contributions [would] buy court opinions.'" *Id.* at 30–31 (alterations in original). Second, a May 2017 article encouraged OBA members to warn the public about the harms of politics in the judicial system. Third, a May 2018 article responded to criticism of Oklahoma's merit-based process for selecting judges. Fourth, a November 2018 article advocated for allowing prisoners to bring tort claims against prisons and jails. Fifth, and finally, articles in February and March of 2019 defended and advocated for the role of lawyers in the state legislature.

## B. *Procedural History*

On March 26, 2019, Mr. Schell initiated this lawsuit in the United States District Court for the Western District of Oklahoma, naming only John Morris Williams, Executive Director of the OBA, as a defendant. Mr. Schell subsequently amended his complaint, adding the Chief Justice and Associate Justices of the Oklahoma Supreme Court and members of the OBA's Board of Governors as defendants. Count I raised First and Fourteenth Amendments free speech and freedom of association challenges to Oklahoma's requirement that practicing attorneys join the OBA. On these claims, Mr. Schell sought declaratory and injunctive relief through 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983, 1988. Count II raised First and Fourteenth Amendments free speech and freedom of association challenges to the OBA's use of mandatory bar dues to subsidize political speech, without obtaining OBA members' affirmative consent. Count II contended the OBA, in accord with *Janus*, needed to create an opt-in dues system for the

7

subsidization of political and ideological speech not germane to the goal of regulating the practice of law. To enforce his constitutional rights asserted in Count II, Mr. Schell once again sought declaratory and injunctive relief through 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983, 1988. Count III, relying on *Keller*, raised a First Amendment challenge to the OBA's failure to adopt constitutionally adequate safeguards to prevent the impermissible use of mandatory bar dues.

The defendants moved to dismiss in separate motions. The Chief Justice and Associate Justices of the Oklahoma Supreme Court sought dismissal under Federal Rule of Civil Procedure 12(b)(1) and (6), arguing (1) the individual Justices were not proper parties as no individual Justice could grant Mr. Schell relief; (2) the Justices were immune from suit; and (3) the federal court lacked jurisdiction over the action or, in the alternative, should abstain from reviewing a matter of state law. The Justices also adopted the forthcoming arguments "regarding the constitutionality of the Oklahoma Integrated Bar and Dues" advanced by the other defendants. The Justices, however, did not advance or adopt any argument, in either their motion to dismiss or their reply brief on their motion to dismiss, based on the statute of limitations. Next, Mr. Williams moved to dismiss under Rules 12(b)(1) and (6), arguing (1) the OBA was immune from suit under the Eleventh Amendment; (2) the district court lacked Article III jurisdiction because Mr. Williams could not provide Mr. Schell any relief; (3) *Lathrop* and *Keller* upheld the constitutionality of mandatory bar membership and dues; and (4) the OBA offers procedures for segregating funds that comply with *Keller*. Within his lack-of-Article-III-standing

8

argument, Mr. Williams contended the statute of limitations governing § 1983 actions barred considerations of most of Mr. Schell's allegations regarding the *Oklahoma Bar Journal* articles:

> Even if the past articles could conceivably be construed to relate to any allowable equitable relief (which Williams disputes), all but six concern occurrences beyond the two year statute of limitation[s], and would be time barred. *See* Amended Complaint [Doc 19] at ¶¶ 58–70; *Garcia v. Wilson*, 731 F.2d 640, 651 (10th Cir. 1984) (Section 1983 actions are characterized as personal injury claims); *Baker v. Bd. of Regents of the State of Kan.*, 991 F.2d 628, 630 (10th Cir. 1993) (state law to determine[] applicable limitations period); OKLA. STAT. tit. 12, § 95(2) (two year limitation period for actions for injury to rights not arising from contract).

Supp. App., Vol. I at 54. The members of the OBA's Board of Governors also moved to dismiss, raising arguments in line with Mr. Williams, including an identical argument regarding the statute of limitations.[1]

The district court granted in part and denied in part the motions to dismiss. The district court first rejected the defendants' various arguments as to their claimed immunity from suit. Next, the district court determined it had jurisdiction over the suit, and thus decided there was no reason to abstain from deciding this case.

Turning to the sufficiency of Mr. Schell's pleadings, the district court dismissed Counts I and II of the Amended Complaint for failure to state a claim. Specifically, the district court reasoned that the Supreme Court's decisions in

---

[1] In his responses to the motions to dismiss, Mr. Schell, although citing the pre-March 2017 article in support of his claim, did not address the statute of limitations argument raised by Mr. Williams and the members of the OBA Board of Governors.

*Lathrop* and *Keller* foreclosed Mr. Schell's challenges to membership and mandatory dues.[2] App. at 51 ("In light of the Supreme Court's decisions in *Lathrop* and *Keller*, plaintiff's claims directed to compelled membership in the OBA and to the collection and use of mandatory bar dues to fund activities germane to regulating the legal profession and improving legal services fail.") But the district court denied the defendants' motions to dismiss Count III—the OBA's alleged failure to adopt constitutionally adequate safeguards to prevent the impermissible use of mandatory bar dues.

In March 2020, the OBA Board of Governors adopted a new "*Keller* policy" that enshrined the spending safeguards Mr. Schell had alleged were compelled by the First Amendment. Defendants then filed an unopposed motion to dismiss as moot Count III of the Amended Complaint. Mr. Schell did not oppose the motion. The district court granted the motion to dismiss Count III as moot, dismissed the Amended Complaint, and entered judgment. Mr. Schell timely filed a notice of appeal.

## II.    DISCUSSION

### A.  Standard of Review

"We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1161 (10th

---

[2] In reaching this conclusion, the district court did not address the statute of limitations argument raised by Mr. Williams and the members of the OBA Board of Governors.

Cir. 2018) (quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Finally, "we may affirm on any ground[] supported by the record" so long as the plaintiff has had an opportunity to address the alternative ground. *Bixler v. Foster*, 596 F.3d 751, 760 (10th Cir. 2010) (quotation marks omitted).

### B. Relevant Case Law

"The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech." *Janus*, 138 S. Ct. at 2463. The freedom of speech includes "the right to refrain from speaking at all." *Id.* (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). When speech is compelled, "individuals are coerced into betraying their convictions," and the forced endorsement of objectionable ideas "is always demeaning." *Id.* at 2464. "Compelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns" to a law compelling speech. *Id.*

The right to refrain from speaking includes "[t]he right to eschew association for expressive purposes." *Id.* at 2463. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which

11

embraces freedom of speech." *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 460 (1958). Thus, the Supreme Court "has repeatedly held that rights of association are within the ambit of the constitutional protections afforded by the First and Fourteenth Amendments." *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 543 (1963). "[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–35 (1977). "Freedom of association therefore plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

Oklahoma attorneys are required to pay dues to the OBA. Oklahoma attorneys are also not permitted to eschew association with the OBA, for expressive reasons or otherwise, while continuing the practice of law. At first glance, then, the requirement that Oklahoma attorneys be members of the OBA might appear problematic under the First Amendment. A closer examination of Supreme Court precedent teaches the question is more complex.

### 1. *Lathrop*

In *Lathrop*, a member of the Wisconsin Bar sued for a refund of dues because he did not "like to be coerced to support an organization which is authorized and directed to engage in political and propaganda activities." 367 U.S. at 822 (plurality opinion). He accused the Wisconsin Bar of being, in essence, "a political party." *Id.* at 833. The allegations suggested the Wisconsin Bar partook in six forms of

12

legislative activity: (1) its executive director was a registered lobbyist and spent 5% of his time on legislative activities; (2) the Bar took positions on pending legislation involving matters such as compensation for judges and attorneys, making attorneys notaries public, court reorganization, allowing for personal jurisdiction over non-residents, laws governing federal tax liens, issues of curtesy and dower, and jurisdiction of county courts over inter vivos trusts; (3) a state legislative committee worked with legislators on some of the legislative matters on which the Bar took positions; (4) a federal legislative committee worked on legislation "'affecting the practice of law, or lawyers as a class, or the jurisdiction, procedure and practice of the Federal courts and other Federal tribunals, or creation of new Federal courts or judgeships affecting [Wisconsin] and comparable subjects'"; (5) the formation of special committees to focus and hold discussions on some legislative items, as well as world peace initiatives; and (6) the publication of Wisconsin Bar Bulletins suggesting changes in state and federal law and discussing progress of legislative items. *Id.* at 835–39 (quoting Wisconsin Bar Board of Governors Minutes, Dec. 11, 1959).

Although the Court did not issue a majority opinion, seven Justices agreed the First Amendment right to freedom of association did not proscribe mandatory bar dues or membership. Four Justices disagreed with the plaintiff's characterization of the Wisconsin Bar's activities, in part because "[o]nly two of the [Bar's] 12 committees . . . are expressly directed to concern themselves in a substantial way with legislation" and the Bar took a position on legislation only where there was

13

"substantial unanimity" among its members. *Id.* at 833–34. And the plurality found no meaningful distinction between mandatory bar membership and "union-shop agreements between interstate railroads and unions of their employees[,] conditioning the employees' continued employment on payment of union dues, initiation fees and assessments" that the Court had previously upheld. *Id.* at 842. Additionally, despite the significant legislative activities of the Wisconsin Bar, the *Lathrop* plurality noted, "legislative activity [was] not the major activity of the State Bar." *Id.* at 839. The plurality concluded the Supreme Court of Wisconsin and the Wisconsin Bar, "to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession . . . be shared by the subjects and beneficiaries of the regulatory program . . . even though the organization created to attain the objective also engages in some legislative activity." *Id.* at 843. Thus, the plurality held mandating financial support for the Bar did not infringe an attorney's First Amendment, freedom of association right. *Id.* But, concluding the plaintiff's complaint lacked sufficiently specific allegations, the plurality declined to reach the question of whether the structure of the Wisconsin Bar violated an attorney's First Amendment right to free speech. *Id.* at 845–46.

Two Justices concurred in the judgment but criticized the plurality for not endorsing the Wisconsin Bar's right "to use, in whole or in part, the dues of dissident members to carry on legislative and other programs of law reform." *Id.* at 848 (Harlan, J., concurring). Those two Justices agreed, therefore, that the plaintiff's freedom of association claim failed. *Id.* at 850.

14

Justice Whittaker also concurred in the judgment, writing only for himself. His concurrence states, in its entirety:

> Believing that the State's requirement that a lawyer pay to its designee an annual fee of $15 as a condition of its grant, or of continuing its grant, to him of the special privilege (which is what it is) of practicing law in the State—which is really all that is involved here—does not violate any provision of the United States Constitution, I concur in the judgment.

*Id.* at 865 (Whittaker, J., concurring).

## 2. *Abood*

In *Abood*, state law permitted local governmental employers to enter "agency shop" agreements wherein a designated union would represent all employees, and each employee, regardless of whether she wished to be a member of the union, was required to pay union dues as a condition of employment. 431 U.S. at 211. A group of teachers who opposed union collective bargaining for public employees, raised a freedom of association challenge to "agency shop" agreements and mandatory dues. *Id.* at 212–13. Recognizing the state interest in the promotion of harmony and uniformity in contract negotiations, the Supreme Court upheld "agency shop" agreements for those portions of dues payments that financed a union's collective bargaining activities. *Id.* at 229, 232. However, the Supreme Court held that public employees who did not join the union could not be required to pay dues that funded non-collective-bargaining activities such as the union's expression of political views. *Id.* at 235–36.

15

**3.** *Keller*

In *Keller*, members of the California Bar raised First Amendment freedom of speech and freedom of association challenges to the "use of their membership dues to finance certain ideological or political activities to which they were opposed." 496 U.S. at 4, *see id.* at 5–6. Specifically, the plaintiffs challenged forced membership and mandatory dues in light of the California Bar's lobbying of the legislature and governmental entities, filing of amici briefs, engagement in educational programs, and holding of an annual conference at which issues of current interest were debated and resolutions on those issues adopted. *Id.* at 5–6. "The Supreme Court of California rejected this challenge on the grounds that the State Bar is a state agency and, as such, may use the dues for any purpose within its broad statutory authority." *Id.* at 4.

The Supreme Court disagreed with that holding but nevertheless reaffirmed "that lawyers admitted to practice in the State may be required to join and pay dues to the State Bar." *Id.* The Supreme Court reasoned "that all of the lawyers who derive benefit from the unique status of being among those admitted to practice before the courts should be called upon to pay a fair share of the cost of the professional involvement in this effort." *Id.* at 12. But the Supreme Court drew a balance, allowing state bar associations to "constitutionally fund activities germane to those goals" but not use mandatory dues to "fund activities of an ideological nature which fall outside of those areas of activity." *Id.* at 14. The Supreme Court did not draw a fine line between germane versus non-germane, ideological activities, but it did state a "guiding standard" for assessing that question: "[W]hether the challenged

16

expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Id.* (quoting *Lathrop*, 367 U.S. at 843). Along these lines, the Supreme Court noted

> [c]ompulsory dues may not be expended to endorse or advance a gun control or nuclear weapon freeze initiative [but,] at the other end of the spectrum[,] petitioners have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the Bar or proposing ethical codes for the profession.

*Id.* at 16. Thus, the Supreme Court generally applied the rule from *Abood* that mandatory dues could be used for activities central to goals and purposes germane to a bar association's legitimate functions but not for ideological purposes extraneous to the recognized goals and purposes of a bar. *Id.* at 17.

The Supreme Court's opinion, however, did not end there. Rather, the Court acknowledged the plaintiffs also had advanced "a much broader freedom of association claim than was at issue in *Lathrop*." *Id.* at 17. Specifically, the plaintiffs argued they could not "be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood*." *Id.* But the Court declined to address this claim because the California courts had not addressed it first.

## 4. *Janus*

In *Janus*, public employees opposed to collective bargaining challenged forced subsidization of union collective-bargaining activities. 138 S. Ct. at 2459–60. The Supreme Court overruled *Abood*, concluding *Abood* was "poorly reasoned," and

"countenanced . . . free speech violations." *Id.* at 2460, 2465. The Supreme Court held "the compelled subsidization of private speech seriously impinges on First Amendment rights [and] cannot be casually allowed." *Id.* at 2464. Concluding *Abood* overemphasized the importance of "labor peace" where that compelling state interest could be advanced without imposing a mandatory dues system, the Supreme Court held public employees could not be forced to subsidize union collective-bargaining activities as a condition of employment. *Id.* at 2465–66, 2486. And since *Janus*, two Justices have stated they would reconsider *Keller* in light of *Janus*:

> Our decision to overrule *Abood* casts significant doubt on *Keller*. The opinion in *Keller* rests almost entirely on the framework of *Abood*. Now that *Abood* is no longer good law, there is effectively nothing left supporting our decision in *Keller*. If the rule in *Keller* is to survive, it would have to be on the basis of new reasoning that is consistent with *Janus*.

*Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1720 (2020) (Thomas, J., dissenting from the denial of certiorari).[3]

### C. The First Amendment Permits Mandatory Bar Dues

The Supreme Court has recently applied "exacting scrutiny" to mandatory dues, in the union context, without ruling out the possibility that strict scrutiny might be appropriate. *Janus*, 138 S. Ct. at 2465. A law compelling subsidies for private speech may survive exacting scrutiny only when it serves "a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of

---

[3] Justice Gorsuch joined Justice Thomas's dissent. *Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1720 (2020).

associational freedoms.'" *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 310 (2012) (alterations in original) (quoting *Roberts*, 468 U.S. at 623).

Although *Janus* suggests *Keller* is vulnerable to reversal by the Supreme Court, at this time *Keller* remains binding precedent on this court. And under that precedent, Mr. Schell's Amended Complaint failed to state a plausible claim that the OBA's mandatory dues are unconstitutional.

Mr. Schell's primary argument as to mandatory dues is to recast the holding of *Keller*. According to Mr. Schell, *Keller* "held that mandatory bar dues are subject to the same constitutional rule that applies to mandatory union fees." Appellant Br. at 28 (internal quotation marks omitted). In Mr. Schell's view, *Keller*'s discussion of *Abood* was dicta, meant only to illustrate how the constitutional rules then in effect would apply to a bar association. Mr. Schell asserts that if we were to apply *Keller* literally, now that *Abood* has been overturned, we would violate *Keller*'s core holding that the same rule applies to unions and bar associations. And he contends that applying *Janus*' rule here dictates the conclusion that the OBA's mandatory dues are unconstitutional.

Mr. Schell's reading of *Keller* is unconvincing. In his view, the second half of the Court's opinion was a recapitulation of *Abood* and *Hudson* for no reason other than additional explanation of their holdings. But there is a far more likely explanation for the Court's extended discussion concerning "useful guidelines for determining permissible expenditures." *Keller*, 496 U.S. at 14. In our view, the Court used the discussion of union expenditures in *Abood* and *Hudson* to provide context

19

for its analysis of the analogous—but not identical—expenditures by bar associations. That discussion was not dicta. *Keller*'s holding is meaningfully distinct from *Abood*'s holding for the same reason that bar associations are meaningfully distinct from unions, despite the "substantial analogy" between the two types of entities. *Keller*, 496 U.S. at 12. Specifically, the analysis conducted in *Janus*, which drew into question the furtherance of the state's interest in "labor peace" through "agency shop" agreements, is not directly in play for "regulating the legal profession" and "'improving the quality of the legal service available" were the interests identified in *Keller* in support of mandatory bar dues. *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843).

It follows that *Janus* did not overrule *Keller*'s discussion of *Abood*, or its related discussion of germaneness, as the test for the constitutionality of mandatory dues and expenditures.[4] To be sure, the Supreme Court may reexamine its precedent on mandatory bar dues, but it did not do so in *Janus*.

Even if Mr. Schell were correct that most of *Keller* is dicta, we would still be bound to follow it. "[W]e are bound by Supreme Court dicta almost as firmly as by the Court[']s[] outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125

---

[4] The defendants argue some or all of Mr. Schell's appeal is unripe and non-justiciable because he does not allege the OBA has engaged in political or ideological activities since the OBA adopted its new "*Keller* policy." Yet, there is no reason Mr. Schell must challenge the new policy to challenge the ongoing requirements of mandatory membership and dues still in effect.

(10th Cir. 2015) (internal quotation marks omitted). That is particularly true when the "dicta squarely relates to the holding[] itself, and therefore is assuredly not gratuitous." *Id.* For the reasons already explained, *Keller*'s discussion of germaneness is related to, but distinct from, its discussion of the analogy between unions and bar associations. And to the extent *Janus* enfeebled parts of *Keller* by overruling *Abood*, we are nevertheless bound to "follow the case which directly controls." *Rodriguez de Quijas*, 490 U.S. at 484. Here, that case is *Keller*, unless and until the Supreme Court tells us otherwise.

In conclusion, *Keller* established a germaneness test for the constitutionality of mandatory bar dues. *Janus* did not replace that longstanding test with exacting scrutiny, and the Supreme Court has yet to announce the impact of that decision on its holdings in *Keller* and *Lathrop*. Consequently, we affirm the district court's dismissal of Count II.

### D. The First Amendment and Mandatory Bar Membership

We first consider the proper scope of Mr. Schell's Count I free speech and freedom of association claims based on mandatory bar membership under the applicable statute of limitations. We then conclude that the allegations occurring within the applicable statute of limitations advance a plausible freedom of association claim not foreclosed by *Lathrop* and *Keller* and warranting discovery.

### 1. Statute of Limitations

On appeal, defendants contend most of Mr. Schell's allegations are barred by the statute of limitations. "The statute of limitations period for a § 1983 claim is

dictated by the personal injury statute of limitations in the state in which the claim arose." *McCarty v. Gilchrist*, 646 F.3d 1281, 1289 (10th Cir. 2011). Oklahoma law provides a two-year statute of limitations for "an action for injury to the rights of another, not arising on contract." Okla. Stat. tit., 12 § 95(A)(3).[5] Where Mr. Schell initiated this action on March 26, 2019, only allegations occurring on or after March 26, 2017, fall within the statute-of-limitations period.[6] Based on this conclusion, neither of the direct examples of the OBA engaging in legislative activity

---

[5] Although the appellees argue for application of a two-year statute of limitations, they incorrectly cite Section 95(2) of Title 12 of the Oklahoma Statutes as the governing provision of law. Because appellees identify the proper two-year time period, we overlook the typographical error in their citation to authority.

[6] In reaching this conclusion, we are aware that it remains an open question in this circuit whether the continuing violation doctrine applies in the § 1983 context. *See Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018) ("The continuing violation doctrine was developed in the Title VII employment law context . . . and this court has not yet decided whether it should apply to § 1983 claims."). Assuming the continuing violation doctrine applies, the burden was on Mr. Schell to raise an argument under that doctrine and show similar violations occurred both before and within the statute-of-limitations period. *See Bruno v. W. Elec. Co.*, 829 F.2d 957, 961 (10th Cir. 1987) (placing burden on plaintiff to show and establish continuing violation); *see also Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980) ("While the statute of limitations is an affirmative defense, when the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute."). By not responding to the statute-of-limitations argument raised by defendants/appellees before the district court and on appeal, Mr. Schell never attempted to satisfy the continuing violation doctrine standard. Furthermore, although the Chief Justice and Associate Justices of the Oklahoma Supreme Court failed to raise a statute of limitations defense in the district court, Mr. Schell, by not addressing the issue on appeal, has waived the waiver. *See United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006) (failure of party to argue waiver results in waiver of initial waiver argument).

alleged in Mr. Schell's Amended Complaint falls within the statute-of-limitations period, for those instances occurred in 2009 and 2014. Further, we do not consider the publication of the 2016 *Oklahoma Bar Journal* articles.[7] Rather, only the six articles published after March 2017 fall within the applicable limitations period.

## 2. Sufficiency of Allegations Within the Applicable Statute of Limitations

In assessing whether the non-time-barred allegations in Mr. Schell's Amended Complaint are sufficient to advance a claim for a free speech or freedom of association violation, we consider the germaneness of the alleged activities to the valid goals and purposes of the OBA. *See Keller*, 496 U.S. at 13–14; *Lathrop*, 367 U.S. at 843. As stated earlier, the primary inquiry for assessing this matter is whether the challenged expenditures and activities "are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843). In other words, Mr. Schell may not state a plausible freedom of

---

[7] These articles we do not consider based on the statute of limitations include (1) a January 2016 article about *Citizens United v. FEC*, 558 U.S. 310 (2010); (2) a February 2016 article about super PACs and the judiciary; (3) a March 2016 article about the regulation of the oil and gas industry; (4) April 2016 articles about the judicial selection process; (5) May 2016 articles touching on *Citizens United*, climate change, the oil and gas industry, and tribal law; (6) a September 2016 article about the influence of dark money in politics; and (7) a November 2016 article about judicial branch funding. We also do not consider the September 2016 advertisement in the *Oklahoma Bar Journal* for the keynote speech at the OBA's Annual Meeting.

association claim merely by identifying activities by the OBA such as discussion of reorganizing the judicial system or matters impacting the practice of law.

Of the six *Oklahoma Bar Journal* articles appearing within the appropriate time period, four articles, based on the descriptions provided by Mr. Schell in his Amended Complaint, appear germane to the goal of improving the quality and availability of legal services in Oklahoma. As a result, they are in line with those non-attorney-disciplinary activities permitted by the plurality opinion in *Lathrop* and the opinion in *Keller*.

First, the Amended Complaint identifies a May 2017 article encouraging members of the OBA to warn the public about the harms of politics in the judicial system. This article is germane because the judicial system is designed to be an apolitical branch of government, and promotion of the public's view of the judicial system as independent enhances public trust in the judicial system and associated attorney services.

Second, Mr. Schell highlights a May 2018 article responding to criticism of Oklahoma's merit-based process for selecting judges. Again, this article involves the structure of the court system and falls within those activities accepted in *Lathrop* and *Keller*. Further, while other allegations in Mr. Schell's Amended Complaint identify specific *Oklahoma Bar Journal* articles as advancing political or ideological views, he advances no similar contentions with respect to the May 2018 article.

Third, Mr. Schell identifies February and March 2019 articles as advocating for the role of attorneys in the state legislature. But these articles are not inherently

24

political or ideological in nature. Rather, they promote the important role of the OBA's attorney members in using their professional skills to interpret and advise on pending legislation. And, the role of attorneys in legislatures is hardly a new concept as, according to the Congressional Research Service, 214 members of the 116th Congress held law degrees, with more than half the members of the United States Senate holding law degrees. SEE JENNIFER E. MANNING, CONG. RSCH. SERV., R45583, MEMBERSHIP OF THE 116TH CONGRESS: A PROFILE, at 5 (Dec. 17, 2020). Accordingly, the articles are germane to the OBA's core function to advance the interests of the profession.

Mr. Schell's claim, therefore, rests on two *Oklahoma Bar Journal* articles: (1) the April 2017 article criticizing "big money and special interest groups" making campaign contributions and "elect[ing] judges and justices"; and (2) a November 2018 article advocating for the ability of prisoners to bring tort suits against prisons and jails.[8] App. at 31. The district court concluded *Lathrop* and *Keller* foreclosed

---

[8] Mr. Schell's Amended Complaint also alleges that "[t]he OBA continues to support and oppose state legislation" and that "OBA committees also draft and promote state legislation." App. at 28. These allegations lack the level of specificity necessary to advance a First Amendment claim because they neither identify the type of legislation the OBA supports, opposes, and drafts, nor allege that Mr. Schell personally opposes any particular legislative activity undertaken by the OBA since commencement of the statute-of-limitations period in March 2017. *See Lathrop*, 367 U.S. at 845–46 (plurality opinion). Finally, the "Legislative Program" aspect of the OBA, as described by the Amended Complaint, is entirely in accord with those legislative activities discussed in *Lathrop* as insufficient to support a First Amendment claim. *Compare* App. at 27 (citing art. VIII, §§2, 3 of the OBA Bylaws), *with Lathrop*, 367 U.S. at 835–39.

Mr. Schell from advancing a freedom of association claim, particularly to the extent the OBA had engaged only in activities germane to the recognized purpose of a state bar. The district court erred in two respects.

First, it is not apparent the district court analyzed whether all of the OBA's activities were germane to regulating the legal profession and improving the quality of legal services in Oklahoma.[9] Nor was the district court in a proper position to conduct such an analysis. While Mr. Schell provided short and plain descriptions of the April 2017 and November 2018 articles so as to satisfy Federal Rule of Civil Procedure 8, he did not attach the articles to his Complaint or his Amended Complaint. And none of the defendants attached any of the articles in question to their motions to dismiss. Thus, the articles were not in the record before the district court, and subsequently are not in the record before us. Yet, Mr. Schell's allegations about the April 2017 and November 2018 publications make it plausible the articles strayed from the germane purposes of the OBA and discussed matters in an ideological manner.

As to the April 2017 article, views on the appropriateness of "big money and special interest groups" in elections and the ability of donors to "buy court opinions," App. at 31, often break along political lines. And other allegations in Mr. Schell's Amended Complaint support the plausibility of this article having an ideological

---

[9] If the district court conducted such an analysis, it did not express why it believed all the OBA's activities were germane.

tinge, because a few months earlier the OBA allegedly hosted a program speaker who accused "wealthy conservative libertarians" of "paying for judicial junkets" through judicial elections. *Id.* at 30. Thus, without viewing the article, it is impossible to conclude the OBA did not advance a non-germane, ideological position through its April 2017 publication of the *Oklahoma Bar Journal*. The same is true for the November 2018 article about increasing the ability of prisoners to sue prisons and jails. While the article might have promoted the potentially germane purpose of encouraging attorneys to represent prisoners in such litigation, it is equally plausible the article advocated for policies eliminating bars on a prisoner's ability to advance suits against prisons and jails, *see Barrios v. Haskell Cnty. Pub. Facilities Auth.*, 432 P.3d 233, 235–41 (Okla. 2018) (holding the Oklahoma Governmental Tort Claims Act is an invocation of state sovereign immunity against constitutional tort claims against prisons). Bottom line, without the articles in the record, it is not possible to conclude whether the OBA only furthered speech germane to the recognized purposes of a state bar.

This leads us to the second error by the district court. Neither *Lathrop* nor *Keller* addressed a broad freedom of association challenge to mandatory bar membership where at least some of a state bar's actions might not be germane to regulating the legal profession and improving the quality of legal services in the state. *See Keller*, 496 U.S. at 17 (remanding case for consideration of broader freedom of association claim than raised in *Lathrop* because California Supreme Court had not addressed claim). Thus, the district court was incorrect to conclude

27

*Lathrop* and *Keller* necessarily foreclosed Mr. Schell's Count I claim. *See Crowe v. Oregon State Bar*, 989 F.3d 714, 727–29 (9th Cir. 2021) (concluding district court erred in relying on *Lathrop* and *Keller* to foreclose broad freedom of association claim based on mandatory bar membership where plaintiff alleged bar engaged in activities not germane to its purpose).

On remand, the district court shall allow for discovery into the April 2017 and November 2018 *Oklahoma Bar Journal* articles that Mr. Schell identifies in his Amended Complaint. Once the discovery is complete, if defendants seek summary judgment, the district court will need to apply the test from *Keller* to determine whether the articles are germane to the accepted purposes of the state bar. *See Keller*, 496 U.S. at 14. And, if the articles are not germane, the district court will need to assess whether Mr. Schell may advance a freedom of association claim based on these two articles.[10]

---

[10] A potential open issue is to what degree, in quantity, substance, or prominence, a bar association must engage in non-germane activities in order to support a freedom-of-association claim based on compelled bar membership. The *Lathrop* plurality, in concluding that compelled membership in the state bar did not "impinge[] upon protected rights of association," thought it important that "the bulk of State Bar activities serve[d]" the legitimate functions of the bar association. 367 U.S. at 843. The plurality concluded that "[g]iven the character of the integrated bar shown on th[e] record," compelled membership was constitutionally permissible "even though" the bar "also engage[d] in some legislative activity." *Id.* The plurality also observed that "legislative activity [was] not the major activity" of the bar. *Id.* at 839. But because this issue was not adequately argued before us, we do not address it now.

## III.   CONCLUSION

We affirm the district court's dismissal of Count II of Mr. Schell's Amended Complaint but reverse the district court's dismissal of Mr. Schell's Count I freedom of association claim. On remand, the district court shall permit Mr. Schell an opportunity to conduct discovery on that claim relative to the two potentially non-germane *Oklahoma Bar Journal* articles published within the statute-of-limitations period.